Simon L. **HOWARD**, Plaintiff,

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY**, a corporation, et al., Defendants.

No. 62 C 358(3).

United States District Court
E. D. Missouri, E. D.

Aug. 10, 1965.

Margaret B. Wilson, St. Louis, Mo., Robert L. Carter, Barbara A. Morris, and Maria L. Marcus, New York City, for plaintiff.

Ernest D. Grinnell, Jr., and Paul R. Moody, St. Louis, Mo., for defendant St. Louis-San F. R. Co.

Charles R. Judge, St. Louis, Mo., and McGlynn & McGlynn, East St. Louis, Ill., for defendant Brotherhood of Ry. Trainmen.

REGAN, District Judge.

This action, brought on behalf of plaintiff individually and on behalf of a class of Negro employees of the St. Louis-San Francisco Railway Company, seeks a declaratory judgment, injunctive relief and damages against the Railway and the Brotherhood of Railway Trainmen. Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1337, the claim assertedly arising under the Railway Labor Act, 45 U.S.C. § 151 et seq. Plaintiff attempts to rest his suit upon allegedly hostile discrimination, practiced for the purpose of unlawfully invading the employment and security rights of plaintiff and other members of his class.

Motions for summary judgment filed by both defendants were ruled in our memorandum opinion of December 30, 1963. In effect, we then held that only the specific charges of discrimination in job assignments alleged in paragraphs 14 and 15 of the Amended Complaint presented fact issues for determination, and for that reason overruled the motions.

Defendants have now filed new motions for summary judgment, basing the motions in part upon the same documents, affidavits and exhibits set forth in the prior motions and additionally upon new exhibits, affidavits and depositions. Plaintiff has not filed any counter-affidavits. However, subsequent to the submission of defendants' motions, plaintiff moved to strike the motions for summary judgment, alleging that the facts are peculiarly within the knowledge of defendants and that if given time to take the depositions of defendants' officers, he will be able to counteract the affidavits. Depositions were thereafter taken by plaintiff and filed in this cause. They have been considered by the Court in ruling the present motions.

For many years, Negro employees of the Railway such as plaintiff have been known and designated as train porters. Although the present record does not affirmatively so show, it would appear that when the classification of train porter was established, their principal duties "were cleaning the cars, assisting the passengers, and helping to load and unload baggage," and only a relatively small part of their duties were those of brakemen. See opinion of Minton, J., dissenting in Brotherhood of Railroad Trainmen

v. Howard, 343 U.S. 768, l. c. 776, 72 S.Ct. 1022, l. c. 1026, 96 L.Ed. 1283.[1] No doubt the attrition of passenger service contributed to the increasingly smaller percentage of time necessary for train porters to devote to strictly train porter duties, with the result that some years ago it became economically unfeasible for the carrier to continue the employment of train porters unless they were required to perform additional duties ordinarily performed by the craft of brakemen. The latter course was followed, so that for many years strictly train porter duties have occupied only a relatively minor portion of their time, and for the most part their work has entailed essentially the performance of functions of a head-end brakeman on passenger trains. This portion of brakemen's duties thus became part of the "positional field" of train porters. However, they were still train porters doing, in part, and on passenger trains only, the work of another craft. In any event, the Railway has for many years consistently treated and dealt with train porters as a class of employees separate from brakeman, and the Brotherhood has refused to consider them as brakemen or to represent them as such. It is also conceded that train porters are, and for many years have been represented by another union of their own choosing, the Association of Railway Trainmen and Locomotive Firemen, which has been certified as their collective bargaining agent pursuant to an election under Section 2, Ninth, of the Railway Labor Act, and which has negotiated contracts with the Railway on their behalf.

It is quite evident, both from the amended complaint and the briefs, that what plaintiff really seeks, on behalf of himself and the other train porters employed by Railway, is a reclassification of the craft or class of "train porters" to that of brakemen. If this reclassification can be accomplished, the alleged hostile racial classification of which plaintiff now complains will be eliminated. The Brotherhood, as representative of the craft or class of "brakeman" would in such event be required to represent and protect, without discrimination, the interests of all members of that class, including the former "train porters," whether or not the "train porters" were members of the Brotherhood. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. Whatever advantageous contractual provisions have been negotiated by the Brotherhood on behalf of "brakemen" as a class would then be equally applicable to those brakemen who had formerly been classified as "train porters."

At plaintiff's insistence, we have concluded to rule the issue of reclassification de novo. In the prior Howard case, the District Court had held that it had no jurisdiction to determine whether train porters should be classified as brakemen and represented by the Brotherhood, such question being within the exclusive jurisdiction of the National Mediation Board. The Court further found that the controversy, insofar as it related to the right to perform the functions of brakemen, was a jurisdictional dispute which only the National Railroad Adjustment Board had jurisdiction to decide. Howard v. Thompson, D.C.Mo., 72 F. Supp. 695. In reversing the judgment, the Court of Appeals held that the 1946 agreement and its use did not involve the ordinary situation of jurisdictional dispute, but rather constituted the forced take over of the entire positional field of another craft, and as such could be valid only if given effect as "a merging of the two *previously separate* but similar crafts and an accompanying assimilation of the members of the consolidated craft into the annexing craft." Howard

1. We note, in this connection, that plaintiff Howard was originally employed as a brakeman. At his own written request made in December, 1917, he was transferred to the job of "train porter" on his representation that because of injury he was unable to work as a brakeman. All other members of the class made written applications for employment as "train porters," and were employed as such.

v. St. Louis-San Francisco Railway Co., 8 Cir., 191 F.2d 442.[2]

On certiorari to the Supreme Court, that Court held that the District Court had jurisdiction to protect the train porters from racial discrimination practiced against them by the unlawful use of power granted by the Railway Labor Act, and made clear that the Brotherhood, as the statutory bargaining agent of the brakemen, may not use its powers as such to practice racial discrimination against members of *another class* of employees. The racial discrimination there involved (the attempted predatory take over by the Brotherhood of the jobs of train porters) was held to be unlawful "whether colored employees are classified as 'train porters,' 'brakemen,' or something else." For that reason, the Court ordered that the Railroad and the Brotherhood be permanently enjoined from using the 1946 contract there in question (which provided that train porters shall no longer perform any brakemen's duties, thereby in effect abolishing train porter jobs) "or any other discriminatory bargaining device to oust the train porters from their jobs" (343 U.S. l. c. 775, 72 S.Ct. l. c. 1026).

The basic premise upon which the Court of Appeals ruled the first Howard case was that there were in fact two separate crafts—"train porter" and "brakeman"—and that the 1946 agreement under attack "reached out to take over, by forced action, * * * the entire positional field" of the "40-year established and recognized *separate* craft." The Court of Appeals then pointed out (191 F.2d l. c. 445) "What the agreement therefore was meant to do was to compel the Railway to get rid of the position of train porter on its *passenger* trains and to establish the position of head-end

brakeman in its stead." (Emphasis supplied.)

The Supreme Court did not reach this issue, but irrespective of classification, held simply that the "Federal Act thus prohibits bargaining agents it authorizes from using their position and power to destroy colored workers' jobs in order to bestow them on white workers." In the words of Minton, J., dissenting, "The majority reaches out to invalidate the contract, *not* because the train porters are brakemen entitled to fair representation by the Brotherhood, but because they are Negroes who were discriminated against by the carrier at the behest of the Brotherhood." To emphasize the limited scope of its decision, the Supreme Court additionally ruled:

"In fashioning its decree the District Court is left free to consider what provisions are necessary to afford these employees full protection from *future* discriminatory practices of the Brotherhood. However, in drawing its decree, the District Court must bear in mind that *disputed* questions of reclassification of the craft of 'train porters' are committed by the Railway Labor Act to the National Mediation Board. Switchmen's Union [of North America] v. National Mediation Board, supra (320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61)."

Even the minority on the Court was in accord on the question of jurisdiction, although disagreeing with the majority's view that the dispute did not "hinge on the proper craft classification of the porters so as to call for settlement by the National Mediation Board under our holding in Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct.

---

2. That the Court of Appeals actually intended to accord the agreement its valid judicial effect as an assimilation in the two crafts is emphasized in Hester v. Brotherhood of Railroad Trainmen, 8 Cir., 206 F.2d 279, footnote 2, l. c. 282. However, the Supreme Court regarded the opinion as holding that the agreement could be treated as valid only upon the condition that the Railroad and the Brotherhood were willing to recognize the "train porter" as member of the craft of "brakemen," but not otherwise.

95, 88 L.Ed. 61." The dissenting opinion stated:

"I think there was a dispute here between employees of the carrier as to whether the Brotherhood was the representative of the train porters, and that this is a matter to be resolved by the National Mediation Board, not the courts."

After the District Court, on remand of the first Howard case, entered its final decree in the earlier Howard case, plaintiff appealed to the Court of Appeals the District Court's refusal to accord to the 1946 agreement the legal effect of "a consolidation of the positions and crafts of brakeman and train porter and of the membership of the two crafts." In ruling against plaintiff, the Court of Appeals, 215 F.2d 690, held that the decree he sought "could hardly, in terms of the Railway Labor Act and in the language of the Supreme Court's opinion, be regarded as being anything else, for purpose of the present situation, than an intrusion by the court into the forbidden domain of '*disputed* questions of reclassification of the craft of "train porters." ' "

In Hester v. Brotherhood of Railroad Trainmen, 8 Cir., 206 F.2d 279, in ruling a contention that messenger-baggagemen should be regarded as belonging or entitled to belong to the craft of brakemen represented by the Brotherhood, the Court said,

"And until the plaintiffs have sought and obtained from the Mediation Board such an establishment of their claimed and disputed craft status, they necessarily are without any foundation for legally sustaining the critical allegation on which their suit is attempted to be rested."

In UNA Chapter, Flight Engineers' Int'l. Assn., etc. v. National Mediation Board, 111 U.S.App.D.C. 121, 294 F.2d 905, an attempt to obtain a judicial review of an order of the National Mediation Board delineating a bargaining class was ruled in this manner:

"The Court did not err when it dismissed the complaint for lack of jurisdiction. Under the Railway Labor Act only the NMB (or the committee designated by it) has the power to make a craft or class determinations. Switchmen's Union of North America v. N. M. B., 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61. The right given to employees is that of designating, by a majority of those comprising a 'craft or class,' their representatives. See 320 U.S. at pages 300–301, 64 S.Ct. at pages 96–97. It has become well settled that in making 'craft or class' determinations, the NMB may regroup, amalgamate, or splinter 'historic' bargaining groups, taking into account technological and functional changes, and that the decision of the Board in setting up a 'class' for representation in a jurisdictional dispute is unreviewable in the courts."

To place the present case in proper perspective it is helpful to bear in mind that what Howard really decided was that brakemen could not forcibly take over the positional field of train porters, that is, could not *displace* them from *their* jobs.

What then was (and is) the "positional field" of the "class of positions and employees known as 'train porters' "? In the words of the Court of Appeals: "The essence of the duties of this class or craft has always been the performance of the necessary braking work on the head end of Frisco's *passenger* trains." Hence, what plaintiff is proposing in the present action is a reclassification of his class or craft which would result in an *enlargement* of his "positional field," and a take over of part of the positional field of brakemen, with the result that instead of train porters being displaced from *their* jobs (as in the first Howard case), brakemen presently employed on freight trains would conceivably be displaced by the former train porters if permitted to carry over their accumulated seniority—a kind of discrimination in reverse. We are not, of course, ruling the propriety of such reclassification on the limited facts before

us, being convinced that we lack jurisdiction to decide that question.

██ We rule and hold, as we did in our former opinion, therefore, that although this Court has jurisdiction to decide the issue of hostile racial discrimination as such (that is, "whether hostile racial discrimination has been the foundation of unlawful invasions of job rights") it has no jurisdiction to determine whether "train porter" is a proper class or craft classification for employees whose duties in large part are now the same as those of brakemen.

██ Plaintiff argues that the Court should exercise jurisdiction on the ground there is in fact no administrative remedy and that the Supreme Court was mistaken in remitting plaintiff to the National Mediation Board for relief. In this connection, the complaint alleges that the train porters sought relief against the Railroad from the National Mediation Board with respect to their classification, but that the Board "declined to take jurisdiction on the ground that reclassification was cognizable only in a jurisdictional dispute under Section 2, Ninth of the Railway Labor Act, despite the Supreme Court's statement that reclassification was committed to the National Mediation Board." The refusal of the Board to act, whether right or wrong under the circumstances or by reason of the manner and form in which the question of reclassification was presented to it cannot operate to confer jurisdiction on this Court to decide a matter which, under the ruling of the Supreme Court in the prior Howard case Congress has withdrawn from our adjudicatory power.

This brings us to paragraphs 14 and 15 of the Complaint. Paragraph 14 complains of an agreement between the defendants, effective in September, 1950, providing that pool freight crews will be used for handling troop trains. The charge is made that the effect of this agreement is to terminate the services of Negro "train porters" who are restricted to service on passenger trains and to replace them with white brakemen. The

admitted facts are that the Railway replaced passenger crews with freight crews on troop trains in 1946 and that plaintiff and the other members of his class had knowledge thereof since April, 1946. The record discloses that the changeover from passenger to freight crew consist on troop trains was made by the Railway in 1946 after the temporary restraining order had been issued in the prior Howard case, and that testimony respecting these facts was adduced by plaintiff at the trial of that case and was before the Court when the final decree was entered. During the time passenger crews operated troop trains, there were no strictly train porter duties to be performed, and such trains are more comparable to freight trains than to the usual passenger trains. The fact that freight crews received a higher rate of pay than passenger crews was undoubtedly the reason the Brotherhood sought the change. We find that by making the change there was no intent on the part of defendants to discriminate against train porters who are employed only on passenger trains.

██ It is true that in 1950, during one of the periodic revisions of the agreement between the Railway and the Brotherhood, there was incorporated therein a provision for using "pool freight crews" for handling troop trains. The record is not clear as to the reasons for apparently formalizing in 1950 the Railway's consistent practice theretofore since April, 1946. Conceivably, the word "pool" may be the clue. In any event, for several reasons, the mere existence of this provision in the current agreement does not entitle plaintiff to the relief now sought. In the first place, any issue concerning the validity of this issue was tried or triable in the first Howard action. See Powell v. City of Joplin, 335 Mo. 562, 73 S.W.2d 408. "Successive injunction suits are not favored." The undisputed fact that plaintiff and the other members of his class sought no relief against the character of the troop train consist although it was known to them since April, 1946, demonstrates

their acquiescence in the propriety thereof. Working on troop trains was no part of the "positional field" of train porters. Moreover, the record clearly shows that the agreement to use pool freight crews on troop trains was not intended to displace any Negro employees even though as a result some train porters were no longer able to work on troop trains. Finally, and of decisive importance, if and to the extent the agreement should be deemed discriminatory, neither plaintiff nor any of the members of his class has any need for new injunctive relief in this action. The judgment in the earlier Howard case in terms enjoins both the Railway and the Brotherhood from using not only the 1946 agreement but *"any other discriminatory bargaining device to oust plaintiff and those of his class similarly situated from their jobs on said railroad as train porters."* And the Brotherhood was further enjoined from using its statutory position "to discriminate against the plaintiff and his class in the performance of their duties as train porters." "If complainant has obtained an injunction in one court and that injunction is still in force, a second injunction in that or in another court will be refused." 43 C.J.S. Injunctions § 27, p. 459.

■ Paragraph 15 of the Complaint has reference to several specific instances on which the Railway allegedly assigned white "brakemen" to perform duties previously and usually performed by Negro "train porters." The record discloses that the matters complained of resulted from unilateral action in emergencies by railway officials in the exercise of judgment and discretion with no participation by the Brotherhood in the making or implementation of the decisions. One such incident resulted from a train wreck on March 17, 1962, which necessitated the annulment of a run. Although the time claim of the train porter based thereon was rejected (on the ground the train porter contract did not support the claim), this incident has nothing whatever to do with assigning white brakemen to perform "train por-

ter" jobs. In any event, the rejection of the time claim was a grievance as to which the employee had the right to appeal to the National Railroad Adjustment Board, but did not avail himself of the procedure.

Several other unusual emergency situations are complained of. Some resulted from application of the so-called 16 hour law, 45 U.S.C.A. § 62, and others from train wrecks by reason of which the regular train porter would become unavailable. On some such occasions a brakeman would be used as a temporary replacement. Such situations were isolated and required immediate on-the-spot decisions by railroad officials as to the best course to follow. If an error of judgment was made (assuming that a train porter was then actually available on the extra board and could have been reached in time), there is not the slightest basis for holding that the decisions resulted from any cooperative or conspiratorial action between the Railway and the Brotherhood. The only other complaints under paragraph 15 relate to the reduction of crews on some runs as the result of the decline in passenger traffic and the number of passenger cars in service. In these relatively few instances, the train porter was not replaced, although his job was eliminated. The fact is, however, as the testimony of some train porters reveals, that there is no "pattern" of discrimination, and certainly no collusive action between defendants. There are, in fact, some runs in which the brakeman's job has been eliminated, and his duties taken over either by the conductor or by the "train porter." The isolated incidents of management decisions complained of do not, in our opinion, establish the existence of hostile racial discrimination with respect to which this court should act, nor collusion by the Railroad to aid the Brotherhood in allegedly discriminating against "train porters."

■ We should add that whatever may have been the racially discriminatory policy and practice of the Brotherhood in the past, as adjudicated in How-

ard and other cases, there is no factual basis in the present record for plaintiff's charge that the Brotherhood presently is guilty of hostile racial discrimination. It is undisputed that Negro brakemen (but not train porters) are admitted to membership in the Brotherhood, and as such are represented by that union. The Brotherhood no longer is "an exclusively white man's union" (Howard, 343 U.S. l. c. 769, 72 S.Ct. l. c. 1023).

It follows from the foregoing that the separate motions of the Railway and Brotherhood for summary judgment should be and are hereby sustained. All other motions have been mooted by our disposition of the motions for summary judgment.

The Clerk is ordered to enter judgment accordingly.