248 F.Supp. 304 (1965)
Frederick NUNN et al., Plaintiffs,
v.
MISSOURI PACIFIC RAILROAD COMPANY, a Missouri corporation, Defendant.
No. 65 C 198(2).
United States District Court E. D. Missouri, E. D.
November 5, 1965.
As Modified January 31, 1966.
Victor Packman, St. Louis, Mo., for plaintiffs.
Mark M. Hennelly and Robert W. Yost, St. Louis, Mo., for defendant.
*305 MEREDITH, District Judge.
This cause was originally filed in the state court. It was properly removed to this Court under 28 U.S.C.A. § 1441 since this Court would have had original jurisdiction of the matter under 28 U.S. C.A. § 1337, as will hereinafter appear. The plaintiffs are all negroes and members of the Brotherhood of Sleeping Car Porters, which union is their certified collective bargaining representative, and they are classified as train porters. The defendant is a Missouri railroad corporation, created and existing under the laws of the State of Missouri, and engaged in interstate commerce with its principal offices at St. Louis, Missouri. On December 30, 1964, the defendant abolished the position of train porter on six of its passenger trains, to be effective January 4, 1965, resulting in the furloughing of six plaintiffs. On March 4, 1965, the defendant abolished the position of train porter on two additional trains, effective March 8, 1965, effecting three of the plaintiffs. On May 10, 1965, effective May 15, 1965, the position of train porter was abolished on two additional trains and the last three plaintiffs were furloughed. Plaintiffs are seeking relief from the action of the defendant in abolishing their jobs.
Plaintiffs allege in their petition that they are trainmen, enumerating certain duties traditionally performed by them which should qualify them for that title. But, they state that simply because they are negroes they have been classified for collective bargaining purposes as "train porters". It is the plaintiffs' contention that the action of the defendant in unilaterally abolishing their jobs violated § 6 of the Railway Labor Act, 45 U.S. C.A. § 156. That section requires that:
"Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions * * *"
Section 6 is asserted to be applicable to the defendant's action here because "* * * crew consists on defendant's railroad train, and plaintiffs' job functions were based on rules, usage, custom and practice, and also implicit and express agreements which constituted their working conditions."
The defendant's action is alleged to be part of a plan to alter the working condition of train porters as a class and to transfer their job functions to white trainmen. Furthermore, it is alleged that this action is the culmination of a long history of racial discrimination against plaintiffs because they are negroes, thus violating the Interstate Commerce Act, 49 U.S.C.A. § 3; the Missouri Constitution, 1945, Article I, §§ 2 and 10, and Article XI, § 3, V.A.M.S.; and the Fourteenth Amendment of the United States Constitution. The relief requested is that the Court require the plaintiffs to be restored to their jobs pending a determination of the issues for declaratory judgment, and that the actions of the defendant be declared illegal and void.
The history of this particular litigation is that a part of these plaintiffs filed a suit against this same defendant in this Court, cause number 65 C 15, and it was dismissed by Judge Harper as a minor labor dispute. Plaintiffs were granted permission to amend their complaint, which they did, but the amended complaint was thereafter voluntarily dismissed without prejudice. The plaintiffs then refiled substantially the same suit in the state court. Because of the prior dismissal and the importance of the matters alleged, the Court proceeded immediately to a hearing on the merits.
It is readily apparent that the extensive scope and multitudinous ramifications of the allegations contained in this petition encompass problems with which the railroad industry (including management, labor and specialized government agencies) has been struggling for many years. The time and effort which has been devoted to devising consistent, realistic and equitable solutions to these problems is representative of the central *306 tenets of the national labor policy enunciated by Congress in the last thirty years. The Supreme Court has recently reiterated the proposition that this pervasive national labor policy requires that all problems effecting labor-management relations should be solved, so far as possible, through uniform administrative procedures, within which confines exists that expertise necessary to properly assess and balance all the intricate facets of such disputes. See Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), where the Court placed significant limitations on the right of a discharged employee to bring a common law action for breach of contract.
The policy favoring the administrative approach to employee-management problems in the railroad industry has been frequently stated. This uniform administrative process
"* * * is of great importance, reflecting, as it does, the needs and fair expectations of the railroad industry for which Congress has provided what might be termed a charter for its internal government." Pennsylvania R. Co. v. Day, 360 U.S. 548, 552, 79 S.Ct. 1322, 1324, 3 L. Ed.2d 1422 (1959).
The question whether a court has jurisdiction to deal with particular disputes brought before it, or whether, having jurisdiction, it should exercise that jurisdiction, must be approached in terms of "major" and "minor" disputes, as defined in the landmark case of Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S. Ct. 1282, 89 L.Ed. 1886 (1945). The Court classified as "major" disputes those concerning
"* * * the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." (l. c. 723, 65 S.Ct. l. c. 1290)
The second class of disputes, "minor" disputes, concerns
"* * * the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." (l. c. 723, 65 S.Ct. l. c. 1290).
Past decisions have made it clear when, within this context of disputes, the courts should act. There can be no doubt that the court should issue an injunction to maintain or restore the status quo in those situations to which § 6 of the Railway Labor Act, 45 U.S.C.A. § 156, is applicable. These are "major" disputes and the danger of strike is usually present. The court's function in such case is to protect and preserve the integrity and meaningfulness of the processes designed for the peaceful solution of such disputes by enjoining premature changes in agreements. Railway Employees' Co-op. Ass'n v. Atlanta B. & C. Railway, 22 F.Supp. 510 (D.Ga.1938); Manning v. American Airlines, 329 F.2d 32 (2 Cir. 1964); Southern Ry. Co. v. Brotherhood of Locomotive Firemen, etc., 119 U.S.App.D.C. 91, 337 F.2d 127 (1964). The court should also act to declare illegal and enjoin arrangements born of vicious and illogical discrimination, as in Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952). In that case, one union had used its power to coerce the employer into an agreement designed to "destroy colored workers' jobs in order to bestow them on white workers." (l. c. 774, 72 S.Ct. l. c. 1025). And, there is always the inherent equity power to intervene where the violation or obliteration of a right which Congress has created "to protect the interest of individuals or the public is clearly shown * * *" Order of Railway Conductors *307 of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946). Also see Manion v. Kansas City Terminal Ry. Co., 353 U.S. 927, 77 S.Ct. 706, 1 L.Ed.2d 722 (1957) and Westchester Lodge 2186, etc. v. Railway Express Agency, Inc., 329 F.2d 748 (2 Cir. 1964).
We have taken great pains to define the perspective from which we view this cause because of the allegations of discrimination interwoven in this petition. In order to make out an issue of discrimination, which would justify the Court in declaring the defendant's action illegal and void, plaintiffs have relied heavily on the historical pattern by which they have been classified as "train porters". With regard to the § 6 issue, discussed infra, plaintiffs rely on that classification and the positional field to which it allegedly entitles them. But, here they indict that classification and cite it as indicative of the discrimination consistently practiced against them. It is contended that defendant has been one of the prime actors in that discrimination. Plaintiffs allege that defendant has consistently paid them less than brakemen, although they say they perform very much the same jobs. And, the present act of the defendant is said to be merely another step in that pattern; a repeated attempt to displace them by white brakemen, an act declared illegal in Brotherhood of Railroad Trainmen v. Howard, supra. In sum, plaintiffs' assertion would seem to be that, because they performed interchangeably some of the functions performed by employees classified as trainmen, and since all the train porters are negroes, abolition of their positions on the trains constitutes discrimination against them.
There are several grounds upon which the Court's jurisdiction to consider these matters has been challenged. It is questionable whether the defendant's alleged acts of discrimination can be attacked in all the ways here attempted. Thus, it is doubtful whether the defendant is an organization to which the Fourteenth or Fifth Amendment applies. It will be recalled that in the Howard case the union representatives exacted the discriminating agreement while functioning in their statutory capacity as "bargaining representatives". The rationale of the Supreme Court's decision was that
"The Federal Act thus prohibits bargaining agents it authorizes from using their position and power to destroy colored workers' jobs in order to bestow them on white workers. And courts can protect those threatened by such an unlawful use of power granted by a federal act." (343 U.S. 768, 774, 72 S.Ct. 1022, 1025).
There is also a serious question whether the provisions of the Interstate Commerce Act here invoked apply to this type situation. It is also doubtful that plaintiffs can assert their rights under the Missouri Constitution, since they have failed to file a complaint with the Missouri Human Rights Commission. To the extent the question of "discriminatory" classification is interwoven with these allegations, we are constrained to tread cautiously:
"However, in drawing its decree, the District Court must bear in mind that disputed questions of reclassification of the craft of `train porters' are committed by the Railway Labor Act to the National Mediation Board." (Howard, supra, page 775, 72 S.Ct. page 1026)
It does not appear that any steps have ever been taken to test the propriety of this classification before the National Mediation Board.
Assuming arguendo that these claims of discrimination are properly before the Court, careful consideration of all the testimony reveals that they have no substance. The testimony shows that the Railroad's action here was simply a good faith effort on its part to reduce the number of its operating personnel to efficient limits. The history of this particular railroad shows that twenty years ago they had approximately 39,000 employees; five years ago 27,000; and today approximately 20,000. Firemen *308 and brakemen positions, as well as train porters, have been abolished. One of the methods used to reduce the number of required operating personnel has been the introduction of automatic switching devices and other modern advancements on passenger runs. It is undisputed that the head end braking functions which these train porters often performed on passenger trains have decreased considerably because of automation. The importance of this fact is readily apparent from the following remark in the Court of Appeals decision in the Howard case, Howard v. St. Louis-San Francisco Ry. Co., 191 F.2d 442, 444 (8 Cir. 1951):
"In terms of railroad fact and job reality, inherent and incapable of misunderstanding, it is plain that the position of train porter has had existence only because of the braking duties attached to it * * *"
The testimony has shown that the jobs abolished by the defendant have not been filled by anyone else. The testimony also shows that the Railroad fully discussed this matter with plaintiffs and the local head of their union before abolishing the jobs and that every effort has been made to provide other jobs to these men. Plaintiffs cannot satisfy their burden of showing discrimination on the basis of the historical legacy of the Howard case, particularly since the exhibits introduced show that the Railroad fought every attempt by brakemen to take over the train porters' position. The abolishment of these jobs must be viewed in the harsh and cruel factual reality of the mid-twentieth century plight of the American railroad industry, which must painfully find solutions to problems born of having accommodated old ways for too long. Whether the collective bargaining agreement was violated in abolishing these jobs, or whether other methods should have been employed to effect the necessary reduction in operating personnel will be discussed later. At this point we look for discrimination and the evidence totally fails to establish such.
Having disposed of the issue of discrimination, the remaining matter of controversy stands out in stark relief. At issue is whether § 6 of the Railway Labor Act applies to the abolishment of these positions. That section requires the giving of at least thirty days' notice of any "intended change in agreements affecting rates of pay, rules, or working conditions." Plaintiffs first rely on a broad concept of "agreement". Thus, they contend that custom and usage by which they traditionally performed certain functions would be an "agreement affecting * * * working conditions." Second, they assert that the abolishment of their jobs constitutes a change in the "agreement". Finally, they argue that the cases of Howard v. St. Louis-San Francisco Ry. Co., 191 F. 2d 442, 449 (8 Cir. 1951), and Rolfes v. Dwellingham, 198 F.2d 591 (8 Cir. 1952), require that a § 6 notice be given before jobs are abolished.
Two issues are raised by these contentions. First, there is a question as to whether the alleged "change of working conditions" affects matters which are "embodied in agreements." Second, there is the even more fundamental question as to whether there has been any "change" in working conditions. We will deal with the second matter first.
There is nothing in the train porters agreement or in the Uniform Code of Operating Railways which expressly defines the function of train porters, except a provision generally that train porters, brakemen and others will obey the instructions of the conductor. The customary functions of a train porter are to keep the passenger coaches clean, assist the passengers with their luggage, assist the conductor in collecting tickets, work switches on occasions, couple or uncouple cars, pick up train orders and on occasions operate as a flagman. It is undisputed that train porters are required to know the operating rules, just like other trainmen. But, as previously mentioned, it is also undisputed that the head end braking functions which the train porter often performed on passenger trains have decreased considerably because of automation. There was clearly no change, as *309 such, in the agreements in force between the Railroad and the Brotherhood of Sleeping Car Porters concerning the rates of pay, rules, or working conditions of train porters. There was no transfer of specific duties from one craft to another, a factor that was of prime significance in the Howard and Rolfes cases, supra. Thus, it appears that there was no "change in agreements affecting * * * working conditions" here. Instead, the dispute appears to be the interpretation of the existing agreement; i. e.  whether the Railroad had the right to abolish these jobs and leave it up to the train conductor, under his general supervisory powers, to allocate among other members of the operating crew the functions still required which had been formerly handled by train porters. Such a dispute explicitly falls within the category of a "minor" dispute, as defined in the Elgin case, supra, and is one which should be decided by the National Railroad Adjustment Board.
The second issue, whether the alleged "change of working conditions" affects matters which are embodied in "agreements", is ruled by the Supreme Court's primary exposition on § 6 in Order of Railway Conductors of America v. Pitney, supra. We discuss the case in extenso because the issue of "agreements" there found parallels very closely the question before this Court, now that the aspects of racial discrimination have been separated out. During the pendency of a reorganization proceeding, the trustees agreed with the representatives of "yard conductors" that certain trains previously manned by "road conductors" would thereafter be manned by "yard conductors". The "road conductors" union then petitioned the court to instruct the trustees not to displace road conductors and to enjoin such action as long as earlier agreements, alleged to cover the positions in question, were not altered in accordance with the Railway Labor Act. The "road conductors" alleged that its members had operated the trains in issue for the past thirty-five years as a result of negotiations as to rules, rates of pay and working conditions. The Supreme Court held as follows:
"These sections make it clear that the only conduct which would violate § 6 is a change of those working conditions which are `embodied' in agreements. But the answers here specifically denied that the O.R.C. agreements provided that road conductors operate the five trains in question. This put in issue the meaning of the contracts that allegedly embodied the working conditions which the trustees were about to change. The court, therefore, had to interpret these contracts before it could find that § 6 had been violated."
"* * * But Congress had specifically provided for a tribunal to interpret contracts such as these in order finally to settle a labor dispute. Section 3 First (i) of the Railway Labor Act provides that disputes between a carrier and its employees `growing out of * * * the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * may be referred * * * by either party to the * * * Adjustment Board'. The Board can not only order reinstatement of the employees, should they actually be discharged, but it can also under § 3, First (o) and (p) grant a money award subject to judicial review with an allowance for attorney's fees should the award be sustained. Not only has Congress thus designated an agency peculiarly competent to handle the basic questions here involved, but as we have indicated in several recent cases in which we had occasion to discuss the history and purpose of the Railway Labor Act, it also intended to leave a minimum responsibility to the courts.
"Of course, where the statute is so obviously violated that `a sacrifice or obliteration of a right which Congress * * * created' to protect *310 the interest of individuals or the public is clearly shown, a court of equity could, in a proper case intervene. (citations omitted) But here it does not clearly appear whether the statute has been violated or complied with or that the threatened action `would be prejudicial to the public interest.' (citations omitted) * * * The record shows, however, that interpretation of these contracts involves more than the mere construction of a `document' in terms of the ordinary meaning of words and their position. (citations omitted) * * * The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue." (326 U.S. l. c. 565-567, 66 S.Ct. l. c. 324-325). (Emphasis added.)
These policies have been consistently reiterated: Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950); Pennsylvania R. Co. v. Day, 360 U.S. 548, 79 S.Ct. 322, 3 L.Ed. 2d 1422 (1959). It has been made clear that this approach is not restricted to jurisdictional disputes. Order of Railway Conductors of America v. Southern Ry. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811 (1950). The Eighth Circuit has recently restated these rules, in the context of internal union grievance procedures, in Neal v. System Board of Adjustment, 348 F.2d 722 (8 Cir. 1965).
Thus, even if we were to find that the abolishment of the jobs here in question could constitute a change in working conditions requiring a § 6 notice, we must also find that the working conditions involved had been "embodied in agreements." And we do not so find. As we mentioned earlier, the rights of the railroads with regard to their many classes of employees has been a subject of great concern for many years. Much time and effort has been expended within administrative channels to devise uniform and consistent solutions to the questions of job rights, etc. This is precisely the type of situation to which the Pitney case referred. The combination of circumstances which justified the judicial action in the Howard and Rolfes cases, supra, are totally lacking here. It appears that the plaintiffs have made no effort to avail themselves of the administrative processes open to them. From this posture, the Court cannot accept their bald assertion that they have no adequate administrative remedy. Accordingly, an order will be entered dismissing their cause without prejudice to the right of the plaintiffs to seek appropriate administrative relief.