**UNITED STATES of America, by Ramsey CLARK, Attorney General,**

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY CO.**

and

**United Transportation Co., successor to Brotherhood of Railroad Trainmen.**

**No. 67 C 243(A).**

United States District Court,
E. D. Missouri, E. D.

March 9, 1971.

Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., William B. Fenton, Robert R. Marshall and Andrew J. Ruzicho, Dept. of Justice, Washington, D. C., Stephen J. Pollak, Asst. Atty. Gen., Civil Rights Division, Washington, D. C., for plaintiff.

Paul R. Moody, St. Louis, Mo., for St. Louis-San Francisco Ry. Co.

Charles R. Judge, St. Louis, Mo., for United Transp. Union, Successor to Brotherhood of Railroad Trainmen.

## MEMORANDUM AND ORDER

HARPER, District Judge.

Invoking Title VII of the Civil Rights Act of 1964 (42 U.S.C.A. § 2000e et seq.), the United States charged the St. Louis-San Francisco Railway Company (hereinafter referred to as Frisco) and the Brotherhood of Railroad Trainmen (hereinafter referred to as Brotherhood) with having engaged in a "policy and practice" of discrimination against Negroes on account of their race. The amended complaint contains several allegations of discrimination. However, at the pre-trial conference the parties agreed to limit the issue to the alleged racial discrimination against the craft formally known as train porters.[1] The plaintiff contends that the Negro train porters performed the same substantial duties as those duties performed by their alleged white counterparts, the railway brakemen. The plaintiff then avers that the train porters were artificially classified as porters and not brakemen due to their Negro race. They maintain that the above unlawful racial classification of train porters was established by Frisco and was perpetuated by Brotherhood. As a result of this alleged racially discriminatory practice, the Negro train porters have been denied equal employment opportunities, advancement and compensation as compared to the white brakemen. The plaintiff, under Title VII of the Civil Rights Act, seeks to have this court reclassify the former train porters as brakemen and to have former train porters carry over their seniority into the brakemen craft.

This case represents but another segment in the never ending encounters between the Negro train porters and the brakemen. The first case was commenced in 1946, Howard v. Thompson, 72 F.Supp. 695 (E.D.Mo.1947), appealed Howard v. St. Louis-San Francisco Railway Co., 191 F.2d 442 (8th Cir. 1951), and reviewed on grant of certiorari in Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); the second case was Howard v. St. Louis-San Francisco Railway Co., 215 F.2d 690 (8th Cir. 1954); and the third case was Howard v. St. Louis-San Francisco Railway Co., 244 F.Supp. 1008 (E.D.Mo.1965), appealed Howard v. St. Louis-San Francisco Railway Co., 361 F.2d 905 (8th Cir. 1966), cert. den. Howard v. St. Louis-San Francisco Railway Co., 385 U.S. 986, 87 S.Ct. 598, 17 L.Ed.2d 448 (1966). The prob-

---

1. Passenger service was terminated by Frisco in 1967. Thereafter, the train porters craft was not recognized by Frisco.

lem also has been dealt with in Nunn v. Missouri-Pacific Railroad Co., 248 F. Supp. 304 (E.D.Mo.1966); and in Norman v. Missouri-Pacific Railroad Co., 414 F.2d 73 (8th Cir. 1969). This court takes judicial notice of the extensive prior litigation between the train porters and the brakemen.

The craft of train porters was recognized by Frisco from 1918 until 1967. For a number of years prior to their elimination by Frisco, the train porters were represented by the Association of Railway Trainmen and Locomotive Firemen. The duties performed by the train porters were only on passenger trains and consisted of passenger-assistant tasks and some braking work on the head end of passenger trains. The craft known as brakemen was represented for years by the Brotherhood of Railway Trainmen.[2] The brakemen craft performed braking duties on both passenger and freight trains. There were only a very small number of Negroes in the brakemen craft when the Civil Rights Act was passed.[3] Also, it is undisputed that Frisco has always dealt separately with the unions that represent the various crafts of which there were some eighteen.

In Brotherhood of Railroad Trainmen v. Howard, supra, the Supreme Court prohibited the brakemen union from forcing the Railroad by means of a threatened strike to discontinue the train porter jobs and replace them with brakemen. The Supreme Court held: First, the brakemen's union is prevented by the Railway Labor Act from eliminating Negro train porter jobs in favor of brakemen; second, the reclassifying of train porters as brakemen is committed by the Railway Labor Act to the National Mediation Board. In Howard v.

St. Louis-San Francisco Railway Co., 361 F.2d 905 (8th Cir. 1966), the train porters sought to be classified as brakemen. In denying relief, the Court of Appeals followed the decision of the Supreme Court in *Howard*, supra, and held that the district court had no jurisdiction to reclassify or place the craft of train porters into the craft of brakemen. In substance, the train porters' last complaint and this cause of action commenced by the United States are the same. The record in this case reveals that the reason this suit was instituted was the fact that the courts held against the train porters in 244 F.Supp. 1008; 361 F.2d 905; and 385 U.S. 986, 87 S. Ct. 598, 17 L.Ed.2d 448. In both instances the plaintiffs maintain that the train porters performed the essential duties of a brakeman, and that Frisco has refused to classify them as such because of their Negro race. This problem had never been presented under the Railway Labor Act. The present litigation does, however, differ in two respects from the past case on this subject: First, this action is commenced by the United States and not a private individual, and second, this action is brought after the enactment of the Civil Rights Act of 1964. In the *Howard* cases the courts have uniformly held they have no authority to reclassify crafts under the Railway Labor Act. However, the factual allegations within the plaintiff's amended complaint allege a racially inherent discriminatory practice that the plaintiff contends is expressly prohibited by Title VII of the Civil Rights Act.

■ Frisco and Brotherhood raise the following affirmative defenses: Res judicata, collateral estoppel, and the failure to join indispensable parties. All of these defenses are rejected by this court.

---

2. In 1969, the United Transportation Union succeeded to and assumed the rights and obligations of the Brotherhood.

3. In 1928, Frisco entered into an agreement with the Brotherhood which excluded Negroes from being employed in train, engine or yard service, except as train porters. This agreement was rescinded in 1949.

The defenses of res judicata and collateral estoppel must be viewed in terms of the Civil Rights Act of 1964, and in particular, Title VII, § 703(a) (2) and § 703(c) (2) (42 U.S.C.A. § 2000e–2). The pertinent portions of this part of the Equal Employment Opportunity Act provide:

"Section 703(a) It shall be an unlawful employment practice for an employer—

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

"Section 703(c) It shall be an unlawful employment practice for a labor organization—

"(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or"

The factual allegations of this complaint are in part similar to those expressed in Norman v. Missouri-Pacific Railroad, supra. There, as in this case, the complaint alleges racial discrimination by the unlawful refusal of a railroad company to classify the train porters as brakemen. It is contended that the above refusal denied to the train porters a higher rate of compensation and advancement. In *Norman*, the Eighth Circuit Court of Appeals considered the *Howard* cases, and then rejected the Railroad's position that the prior refusal to classify train porters as brakemen operated as a bar to the present action. The court stated 414 F. 2d at 84:

"[T]he train porters in a class action contended that they were relegated to the class of train porters solely because of race. We stated at 906 of 361 F.2d that the District Court 'failed to find hostile racial discrimination.' We viewed the issue on appeal as whether 'the District Court has jurisdiction and power, to require by appropriate order, that all Negro employees of Frisco, now in the craft or class of train porter, be placed in the craft or class of brakemen.' Id. Both of these cases were viewed within the context of jurisdictional disputes or craft classifications constituting grievances solely cognizable under the Railway Labor Act. *The applicability of Title VII of the Civil Rights Act to the plaintiffs' complaint has not been decided by the courts. We hold, that Nunn and Howard are not a bar to the present action.*" (Emphasis added.)

The court in *Norman* expressly recognized that Title VII of the Civil Rights Act of 1964 may provide additional statutory relief for an individual even when the industry is subject to the Railway Labor Act. In considering both of the above acts, the court stated at 82–83:

" * * * The Railway Labor Act is not basically a fair employment practice act nor has it been utilized as such. Its basic purpose is to foster and promote collective bargaining between employees and employers with a provision for continuity of service to the public while setting up a detailed and elaborate procedure for the resolution of major and minor disputes that occur in the operation of the railroads. On the other hand Title VII of the Civil Rights Act specifically prohibits racial and other discrimination in employment and employment opportunities.

This court in Bremer v. St. Louis Southwestern Railroad Company, 310 F.Supp. 1333, at page 1339 (E.D.Mo. 1969), followed *Norman*, supra, and stated with regard to an allegation of discrimination:

"Prior to the enactment of the Civil Rights Act of 1964, disputes of this nature were unquestionably solely within the province of the Railroad Adjustment Board. Title VII of the Act has created an additional remedy, without eliminating the prior one, and plaintiff has stated a cause of action under the Act."

Thus, in the light of the above cases, the allegations of the plaintiff are not barred by either res judicata, or, in the alternative, collateral estoppel.

 Frisco and Brotherhood also sought to dismiss this complaint for the failure of the plaintiff to join those persons employed by Frisco as brakemen whose seniority rights could be affected by the requested relief. It is the position of the defendants that the brakemen under Rule 19, Federal Rules of Civil Procedure, as amended, are indispensable parties to this action. This contention is without merit. As stated by the court in *Norman*, supra, 414 F.2d at 85: "[E]ven contract rights such as seniority may be modified by public policy or by changes in law." The Brotherhood is fully capable of representing the interest of its members. Thus, the joinder issue as raised by the defendants is lacking in merit.

 Turning to the case on its merits, basically the court is called upon to decide two issues: (1) Should the members of the train porter craft be declared members of the brakemen craft and given seniority in the brakemen craft based on their seniority in the train porter craft; and (2) Has Frisco engaged in the policies and practices of discrimination against employment of Negroes as brakemen since the passage of the Civil Rights Act?

The plaintiff cites many cases to support its request for carryover seniority. However, only Local 189, United Papermakers & Paperworkers, etc. v. United States, 416 F.2d 980 (5th Cir. 1969) cert. den. 397, U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970), and Quarles v. Philip Morris Incorporated, 279 F.Supp. 505 (E.D.Va.1968), permitted the merging of seniority units in order to eliminate the present effects of past discrimination. Both *Local 189* and *Quarles* expressly condition their policy upon the court's finding that maintaining of the respective units were not essential to business necessity. In *Local 189*, the court stated at 989 of 416 F.2d:

" * * * *The record supports the district court's holding that job seniority is not essential to the safe and efficient operation of Crown's mill.* The defendants' chief expert witness, Dr. Northrup, made it clear that he considered mill seniority 'disastrous' only to the extent that it allowed *all* men in a slot to bid on the basis of their time at the mill. He stated that mill seniority in that sense would create labor unrest because its main effect would be to allow whites to 'jump' other whites and Negroes to 'jump' other Negroes."

The defendants contend that carryover seniority is precluded by business necessity. In United States v. H. K. Porter Company, 296 F.Supp. 40 (N.D.Ala.S.D. 1968), the court held that legitimate operational considerations may preclude the merger of independent units. In the *Porter* case the court stated at 67:

" * * * On the other hand, based on the evidence which it has heard on the point, the court finds that the requisite skills and abilities differ in substantial measure from department to department, that satisfactory job performance in one department is not an accurate predictor of satisfactory job performance in another department, and that the departmental structure of this plant is in fact based on

the particular and distinctive type of work performed by each of the departments."

The above mentioned cases are not in conflict. The cases uniformly hold that business necessity precludes merger. The Fifth Circuit Court of Appeals in *Local 189, supra,* at page 993 of 416 F. 2d, said:

"In other words, the record in that case, as the district court viewed it, showed that safety and efficiency, the component factors of business necessity, would not allow relaxation of the job seniority system. We see no necessary conflict between *Porter's* holding on this point and our holding in the present case."

The resolution of the court's first issue necessitates a review of the duties of a train porter and those of a brakeman.

In beginning a determination of the classification issue, this court is confronted with extensive prior litigation between the train porter and brakeman crafts. A review of the *Howard* cases leaves unanswered the essential duties that a train porter and brakeman performed. Moreover, it is equally apparent from an examination of the *Howard* cases that the respective courts have never considered if a distinction exists between the duties of a passenger brakeman and those duties performed by a freight brakeman. It would appear that the past *Howard* cases dealt at most only with the difference between the train porter and a passenger brakeman. With the termination of passenger service in 1967, the position of passenger brakeman was eliminated. Since the plaintiff's requested relief seeks reclassification and carryover seniority for the train porters, this court must determine if the train porter possesses the requisite skills and abilities in the freight brakeman's craft based on the record in this case.

The plaintiff maintains that the former train porters perform the same essential braking duties on the head end of passenger trains as those performed by the brakemen on both passenger and freight trains. Several of the train porters stated in their depositions that ninety-five percent of their duties consisted of braking duties. From a review of the credible evidence in the record, this percentage estimate is without a basis and is hereby rejected by this court.

Mr. Falls, a former train porter, and a witness for the plaintiff, stated in his deposition (pp 21 through 24) that he performed the following duties as a train porter: Looked after and checked on the lighting, heating and air-conditioning on passenger trains; kept up the general appearance of the passenger coaches by picking up debris, bottles, cups, and sweeping the aisles and under the seats; assisted passengers boarding and departing from trains; helped passengers with their baggage, called out train stations, advised them with respect to making connections, and answered any remaining questions the passengers might have; picked up hatchecks for the passengers; sold pillows to the passengers; kept the restroom on the passenger trains clean; and checked for items the passengers may have left behind after the passengers departed the train. The testimony of the other train porters also indicates that they performed the above mentioned duties.

At the trial, Nelson Burton, a former train porter, and a witness for the plaintiff, testified that in addition to those duties listed by the witness Falls, he also took meal orders and prepared accident reports on any passengers who might be injured. Mr. Brookshire, a brakeman and a witness for the plaintiff, testified that the primary duty of a train porter was to assist and care for the train passenger. Train porter Howard, who in 1914 was hired by Frisco as a freight brakeman after passing tests, and later requested and was granted a transfer to the train porter craft (Deposition pp 36–38), testified that he was

on many occasions reprimanded in connection with his handling and taking care of passengers. The evidence presented by the plaintiff in itself establishes that the primary function of a train porter was that of providing for the care and comfort of the passengers.

The defendants maintain that the craft division between train porters and brakemen is based upon functional differentiations. From a review of the record, it is evident that the duties of a train porter are essentially different from those duties performed by either a passenger or freight brakeman.

The record discloses that the average brakeman begins his employment in the yards or on *local* freight, progresses to *through* freight, and then prior to 1967 might after many years advance to *passenger* trains. The witnesses Burst and Wilson, brakemen for Frisco, testified that freight work involves long hours, irregular working schedules, and much physical labor. The physical labor consists of switching cars, kicking cars, working handbrakes, repairing mechanical difficulties, and loading and unloading train goods. In addition, Burst, Wilson and McClellan stated that the repair of train equipment was a major problem on freight trains only. This was due primarily to the length of freight trains. The repair work on the freight trains includes: Fixing air hoses, replacing broken knuckles (or train couplings), repairing brake beams, and other train equipment. While the record discloses that the train porter did minimal switching work and other minor duties of a brakeman, it is unmistakably clear from the testimony of plaintiff's own witness (Brookshire) that such duties were only performed on rare occasions, and such consisted of throwing switches and flagging blocks. There is no testimony of any train porter repairing train equipment such as a freight brakeman repairs.

The plaintiff mainly likens the train porter to the passenger brakeman. Although the duties of these two former positions are different, the position of the plaintiff overlooks the many years of seniority that the brakeman had to acquire at the freight level before securing the passenger brakeman position. Mr. Wilson testified that he spent the better part of twenty years working irregular shifts at the freight level.

W. W. Francis, a former brakeman, a supervisor of brakemen, and presently a personnel officer of *Frisco*, testified that the primary duty of a train porter was to look after and care for the comfort of the passengers. Francis stated that the train porter was not qualified to be a freight brakeman as the train porter had utterly no experience on freight trains. The train porter performed some minor duties of a brakeman on occasion, but for the most part the train porter did not possess experience in moving, switching, braking and kicking freight cars, nor in making train repairs. Experience was essential in order to insure safety and efficiency. Moreover, the train porter had no familiarity with switch lists. Mr. Francis noted that experience and initiative are essential to the freight brakeman as trains were longer and involved a minimum amount of supervision.

H. J. Lovelady, a superintendent of terminals at Kansas City, Missouri, stated in his deposition at page 53:

" * * * I would say primarily that (the care of passengers) was the duty of the train porter, the loading and unloading of passengers, furnishing pillows at points, and I guess change diapers if anybody wanted their kids changed. But primarily, care and convenience of the passengers' welfare was his job. If it was necessary, clean the floor, sweep the floor of the coach; as I say, the primary, taking care of the passengers."

C. L. Lester, a former train porter who moved to the brakemen's craft after Frisco terminated passenger service in 1967 (since that time Lester has passed

his conductor's test), stated in his deposition at pages 10 and 11:

"Q Now, referring to your employment for the Frisco as a train porter, what run did you work on?

"A Runs 709 and 710.

"Q Now, during the course of your employment as a train porter did you also have occasion to ride on other of the Frisco's passenger trains and observe the duties performed on those trains?

"A Yes, I did.

"Q Mr. Lester, was it your observation by riding those other trains, and comparing the service performed by the train porters on those trains with the service that you performed on your run, that the run that you had was the hardest run with the most stops?

"A It was.

"Q On the run that you were working on as a train porter on 709 and 710, Mr. Lester, what period of time was involved from beginning to end to complete that run?

"A To begin with it was over five hours, at the ending period was around four hours and fifty minutes.

"Q And approximately what was the mileage covered by that run?

"A 134 miles.

"Q Now, Mr. Lester, of the five hours or four hours and fifty minutes, whichever it took to complete your run, what was the greatest period of time that you would be occupied performing duties other than duties directly connected with the care, comfort and convenience of the passengers?

"A About thirty minutes, average thirty minutes per day working head-in.

"Q Mr. Lester, in your experience and through your observation, being employed by the Frisco Railroad, what was the primary purpose for the employment of a train porter on a passenger train?

"A Well, my first instruction was that the passengers were first, the care of the passengers was first.

"Q And is it a fact that you had many duties to perform on a run in connection with the passengers?

"A Yes, we did."

J. K. Beshears, a former brakeman and now a vice-president of personnel at Frisco, testified that the primary duty of a train porter was passenger assistance. The view of Mr. Beshears was shared by both Mr. Brookshire, a brakeman and witness of the plaintiff, and Mr. Wilson, a brakeman.

In the opinion of this court, the record discloses that the train porter's primary duties always differed from those of any passenger brakeman or a freight brakeman. Although both the train porter and brakeman performed some braking and switching duties, this hollow comparison and attempt to equate the crafts overlooks the following factors: First, the primary duty of the train porter craft as opposed to the brakeman craft; and second, the fact that the train porters were never employed in the freight area.

There is no doubt that the train porter performed some braking and switching duties on passenger trains. However, it is equally apparent from a review of the evidence that such braking duties were minor and incidental to the train porter's primary duty of providing for the care and comfort of the train passenger. All of the former train porters elaborated on the many facets of passenger care that they were expected to perform. As passenger volume declined, the train porter's duties no doubt declined. However, the depositions of company officials, brakemen and former train porters establish that a valid functional classification did exist between train porter and brakeman. The train porter's primary concern rested with the

care of the passenger. On the other hand, the passenger brakeman's responsibility rested with the safety of the trains.

In addition to the plaintiff's failure to distinguish the primary duty of a train porter and brakeman, the record discloses that the train porter has no experience in the freight train area. The train porter has never been employed on freight trains. Moreover, the train porters were excluded from employment in the freight area by the very terms of their labor agreement with Frisco. It is evident from the record that passenger service is relatively free from equipment repair; however, the repairing of equipment is a major problem on freight trains. Also, the record reveals that the train porters have performed only some of the brakeman's duties, and only on rare occasions has the train porter performed these duties. The record reveals that a brakeman's job is a hazardous one. One mistake in switching a freight car could endanger the lives of many railroad men.[4]

From the brakeman's first day with the railroad his duties on local and through freight trains involve not only supporting the delivery of cars and the loading and unloading of goods, but also the corresponding duty of assuring train safety by checking for and repairing mechanical difficulties. Much of his work is outside in all types of weather.

The record indicates that some Negro train porters preferred assignments to the train porter craft, for in the train porter craft the train porter was not subject to the physical labor that the brakeman performed at the freight level. The testimony of train porters Howard (Deposition pp 34–5) and Bagley (Deposition pp 130–1) shows the above to be true. Moreover, the train porter work schedule was on a regular basis (the brakeman's work schedule was irregular at the freight level). The attempt by

the plaintiff to equate the train porter craft with the brakeman craft completely ignores the experience in safety and repair work that the brakeman has obtained at the freight train level. The duties of a train porter and brakeman are essentially different.

This court concludes that service as a train porter does not equip the train porter with the requisite skill and ability to perform a freight brakeman's position in either a safe or efficient manner. The crafts of train porter and brakeman are based upon functional differentiations, that is, distinctive types of work performed by each craft. Most of the members of the various crafts (age permitting) in the Railroad industry could probably with training meet the requirements of the other crafts, but the train porter's absent training does not meet the qualifications of the brakeman's craft.

As to the second issue, this court concludes that the Negro train porters have not been discriminated against since the enactment of the Civil Rights Act in 1965. A brief reference to the testimony regarding railroad industry problems will be helpful.

Mr. McClellan, a conductor for Frisco, stated that the diesel engine replaced the steam engine between 1946 and 1948. This eliminated forty to fifty percent of the freight crews. In 1967, the last two sets of passenger trains were discontinued by Frisco. Mr. Francis, a personnel officer with Frisco, informed the court that this eliminated 190 positions, of which less than ten percent were train porters. The drastic decline in railroad employment was emphasized by Mr. Beshears who is one of Frisco's vice-presidents. Mr. Beshears testified that Frisco's employment has dropped from a high of 28,000 to the present total of approximately 8,000 employees due to the diesel engine, technology advancements and the ceasing of passenger service.

4. Judicial notice of F.E.L.A. cases reveals many injuries to brakemen.

Many employees have suffered from the decline in employment. The figures speak for themselves. Frisco's passenger service was terminated with the approval of the Interstate Commerce Commission. If this court were to grant the proposed relief, it would place the Negro train porters in a favored position only because of the color of their skin. The craft system has always been present within the railroad industry. When freight brakemen positions were eliminated by the diesel engine, the brakemen could not bid on the train porter positions regardless of the seniority they possessed. Now, the court is confronted by the reverse situation. In effect, the train porters seek superseniority. Such is not the intent of the Civil Rights Act.

Furthermore, it is the opinion of this court that the requested relief sought by the plaintiff is inappropriate as the anticipated collateral effects of granting carryover seniority in this case would create inequities. See United States v. Bethlehem Steel Corp., 312 F.Supp. 977, 994–996 (W.D.N.Y.1970). The granting of the requested relief would create the following inequities: First, the proposed seniority carryover remedy would disrupt the brakemen seniority system, and moreover, since promotion to conductor is based to a great extent upon freight service seniority, the remedy would alter the rightful expectations of the present members of the brakemen craft as to future promotional opportunities; and second, the proposed remedy would assure the former train porters of positions, but would overlook the railroad's history of declining employment.

This court concludes that adequate relief has already been accorded to the train porters. Mr. Francis testified with regard to the fifty-six former train porters that the plaintiff claims to be entitled to relief under this cause of action. After researching the company records, Mr. Francis noted that eighteen of the named individuals had performed no compensated service since July 2, 1965 (the effective date of the Civil Rights Act). In addition, ten of the porters were shown to have accepted retirement benefits. Of the remaining twenty-eight train porters, all but one were offered positions with the railroad in other crafts. Frisco was not able to contact the one who had only worked part time the years before. Twelve of the train porters accepted employment in other railroad crafts. Most of these, but not all, accepted freight brakemen positions. A number of the twelve have since been promoted. The remaining fifteen train porters who were offered positions refused, and for the most part stated they had to see their lawyer (plaintiff's attorney in the last *Howard* case). Almost all of these were offered positions as brakemen.

The actions of Frisco in attempting to place these former train porters should be commended. Mr. Beshears testified that he instructed the district managers to give the train porters preference as to employment, and to waive many of the normal employment requirements. These are not the facts that necessitate the use of this court's injunctive power. Unlike Local 189, United Papermakers and Paperworkers, etc. v. United States, supra, and Quarles v. Philip Morris Incorporated, supra, Frisco furnished on its own accord the only affirmative relief that this court could have ordered under the circumstances of this case. This court is cognizant of the fine efforts that Frisco has made to eliminate all taints of racial discrimination, and finds a present company policy and practice that is comparable to the company in Parham v. Southwestern Bell Telephone Company, 433 F.2d 421, at 429 (8th Cir. 1970), in which Judge Bright stated:

"In view of this evidence, we agree with the trial court that no injunction seems necessary or appropriate in this case at the present time. Title VII aims at securing voluntary compliance with the requirements for equal employment opportunities. In enacting

the Civil Rights Act of 1964, Congress placed great emphasis on private settlement and the elimination of unfair practices without resorting to the court's injunctive powers."

Frisco has acted in good faith. This merger is precluded both by business necessity and by the collateral effects the proposed remedy would have on the present and former employees of Frisco. No injunction is warranted.

This memorandum opinion is adopted by the court as its findings of fact and conclusions of law and the clerk will prepare and enter the proper order dismissing the action and giving judgment to the defendants herein.