HOWARD v. ST. LOUIS–SAN FRANCISCO RY. CO. et al.

ST. LOUIS–SAN FRANCISCO RY. CO. v. HOWARD et al.

Nos. 13899, 13900.

United States Court of Appeals Eighth Circuit.

Sept. 11, 1951.

Victor Packman, St. Louis, Mo. and Joseph C. Waddy, Washington, D. C. (Henry D. Espy, St. Louis, Mo. and Charles H. Houston, Washington, D. C., on the brief), for Simon L. Howard, Sr.

A. J. Baumann, St. Louis, Mo. (E. G. Nahler and M. G. Roberts, St. Louis, Mo., on the brief), for St. Louis-San Francisco Ry. Co.,

Charles R. Judge, St. Louis, Mo. (W. Donald Dubail, St. Louis, Mo., on the brief), for Brotherhood of Railroad Trainmen and C. O. Carnahan, General Chairman, etc.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

For more than 40 years, there has existed historically on the "Frisco" Railway a class of positions and employees known as "train porter."[1] The essence of the duties of this class or craft has always been the performance of the necessary braking work on the head end of Frisco's passenger trains. The holders of the position have been required to undergo the same training and to possess the same qualification as those occupying the similar general position of brakeman.

[1] The position of train porter is an entirely separate one from that of sleeping-car porter, day-coach porter, or other special car-attendant.

The job of train porter has been open only to negroes and, because the group has lacked the organizational strength and hold of the brakemen, the wage scale of the position (except during part of the period that the railroads were operated by the Government in and immediately following World War I) has always been less than that of the position of brakeman. There have existed the further differences between the two separately established classes or crafts of employees, that the position of train porter is confined to passenger trains alone and its braking work limited solely to the head end thereof, and that its duties have also included the tasks of keeping the coaches clean and assisting passengers in getting on and off the train.

These aisle-sweeping and passenger-assisting tasks, however, are simply minor and incidental, occupying only, as the record shows, approximately five per cent of a train porter's time. In terms of railroad fact and job reality, inherent and incapable of misunderstanding, it is plain that the position of train porter has had existence only because of the braking duties attached to it and that only because it has made unnecessary the establishing of a head-end brakeman's position on such trains has it had a 40-year survival. Economically and functionally, in free railroad operation, the establishment of the one of such positions on a passenger train necessarily will exclude the existence of the other on it.

These facts are background in the controversy that is before us. The suit involved is one brought individually and representatively, by a train porter on the Frisco, holding that position since 1917, against the Railway, the Brotherhood of Railroad Trainmen and the General Chairman of the Brotherhood, to prevent an agreement made between the Brotherhood [2] and the Railway from being used to oust him and the other Frisco train porters individually and as a class from their jobs and from the Railway—the agreement in its practical and understood effect being

alleged to have required the Railway to convert the position of train porter into the position of brakeman, with the Brotherhood refusing to permit the Railway to treat the conversion as constituting merely a change in job nomenclature and as effecting simply a consolidation of the two similar crafts and, as such, imposing upon the Brotherhood, under its statutory obligation as bargaining agent of the assimilating craft, the duty of protecting equally with its own members, those comprising the merged craft, in their inherent work right, attained employment status and resulting seniority incidents.

More specifically stated, the complaint in effect sought (1) to have declared illegal, in its attempted use to strip the train porters of their jobs by abolishing their class or craft and establishing the position of brakeman for the work, with no change in essential duty or required skill for the job, an agreement made between the Railway and the Brotherhood that "Effective April 1, 1946, the practice of train porters performing work generally recognized as Brakeman's duties will be discontinued;" (2) to prevent the members of the Brotherhood from claiming and taking over the positions of the train-porter group, to the latter's exclusion, as a right created by the agreement; (3) to enjoin the Railway from ousting the train porters from their jobs and employment on the basis of the agreement; and (4) to have it declared that in any event a notice given by the Railway to the train porters on March 9, 1946, immediately following and in consequence of the making of the agreement, that the position of train porter was being abolished as of April 1, 1946, and that their employment would accordingly be terminated on that date, was of no effect, as being violative of the requirement of the Railway Labor Act, 45 U.S.C.A. § 156, that at least 30 days notice must be given of any intended change in agreements affecting working conditions.

The agreement had been exacted from the Railway, as the only means open to it

2. The Brotherhood is collective bargaining representative for the brakeman's craft on the Railway, under the provisions of the Railway Labor Act, 45 U.S.C.A. § 152, Fourth.

to avert a strike which the Brotherhood had called of its members. The Railway's action in abolishing the position of train porter and terminating the employment of the group holding that position was admitted by it to have been taken solely because of and to enable it to carry out the exacted agreement. And in entering into the exacted agreement and undertaking to carry it out, the Railway did not recognize any right or basis in the brakemen to take over and hold the jobs involved, as against the train porters, except such as the agreement itself had created.

The controlling question here is whether the agreement and its use, on the basis of its terms and making, present merely a situation of jurisdictional dispute, such as in the first instance would require an invocation by the train porters of the National Railroad Adjustment Board's interpretative functions, for resolution of the existing rights, before any element of justiciability could properly be said to be involved. See Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318; Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795. The trial court viewed the situation as being simply of that nature.[3]  Howard v. Thompson, D.C., 72 F.Supp. 695.

From the recitation preceding, it will be noted that the agreement does not involve, as in the ordinary situation of jurisdictional dispute, an attempted shift in some mere incident of work as between two continued classes of positions or in some mere segment of individual jobs as between two preserved crafts of employees. The agreement reached out to take over, by forced action, without regard to basis, the entire positional field of another craft, with the industrially inevitable, and so legally intended, result that that 40-year established and recognized separate craft[4] would be pushed off the Railway and cease to have existence. Only abolition of the historical position and craft of train porter could provide room for the position and craft of brakeman to move into the 40-year separately existing field. What the agreement therefore was meant to do was to compel the Railway to get rid of the position of train porter on its passenger trains and to establish the position of head-end brakeman in its stead. This implicit contractual reality the artful language used by the Brotherhood in the exacted agreement is

3. Pursuant to this view the trial court held that no justiciable controversy could be claimed to exist, until the train porters had sought a determination by the National Railroad Adjustment Board of their right to perform the head-end braking work. The court accordingly dissolved an interlocutory injunction, which had previously been issued, but stayed dismissal of the cause as to all issues for a reasonable time to afford the train porters an opportunity to exhaust the administrative remedies of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. The court did, however, declare that the notice given to the train porters of the abolition of their position and termination of their employment as of April 1, 1946, was invalid and that no action could be taken by the Railway on the basis thereof, because such notice failed to satisfy the requirement of the Act, 45 U.S.C.A. § 156, for the giving of at least 30 days notice of any intended change in agreements affecting working conditions, and it prohibited the Railway therefore from carrying such notice into effect. The Railway has cross-appealed from the holding that the notice was thus invalid.

4. Even the Brotherhood itself, as far back as 1928 had recognized the existence of the position of train porter and thus necessarily what that position inescapably implied, when it obtained an agreement from the Railway that, "in the future hiring of employees in train, engine and yard service but not including train porters, only white men shall be employed." This plainly invalid agreement was not abrogated between the Brotherhood and the Railway until after the present suit was instituted. It lends some support to the contention made by the train porters here that the present agreement was intended primarily as a further attempt on the part of the Brotherhood to keep their race out of railroad employment. Since the trial court did not reach a consideration of that factual question and the case is being disposed of here on a legal basis that would be controlling, regardless of what race might be involved, we need not further discuss this contention.

not capable of concealing. Cf. Hunter v. Atchison, T. & S. F. Ry. Co., 7 Cir., 171 F.2d 594, 597, 598.

And this total appropriation of previously separate-class positional field and abolition of established-craft historical existence was, as has been stated, proximately being made to occur on the basis of bare exaction alone. In neither terms nor circumstances of the contracting involved did the Railway deal with the Brotherhood on the basis of the brakemen having any right to the train porters' positional field, except as a forced confiscation and turning over by the Railway of the train porters' rights as the cost to it of having a Brotherhood strike called off.

Further repeating, the only right which the Railway recognized in the brakemen to occupy the train porters' field, in both its dealings and contractual consummation, was whatever the agreement itself had created. And the Railway's action in abolishing the position of train porter and terminating the employment of those holding that position was taken solely to make possible the creation and effectuation in the brakemen of such a right of occupancy as an obligation imposed upon it by the exacted agreement. No dispute has ever existed or now exists between the Railway and the train porters as to the latter's right to continue to occupy their positional field, if the agreement in its making or its consequence, is invalid, so that the Brotherhood and its members would not be entitled to claim any exclusionary right on the basis of it. Again then, only the exacted agreement and the Brotherhood's claim of right under it are therefore proximately responsible for what is being made to happen to the train porters.

Thus, on the basis of the terms and circumstances of the parties' dealings and in the carrying out of what they mutually arrived at, the situation stands contractually as one of attempted predatory seizure and appropriation, by one railroad craft, of another's entire and 40-year established positional field, with the contemplated abolition of that craft as such, and with the assimilating craft refusing to regard its thus acquired right of positional absorption—involving no change in essential duty or skill as to the job but in industrial reality simply a change in nomenclature or designation of the position itself—as imposing any obligation upon it or its statutory representative to protect the historical and craft-orphaned holders of the positional field in their previous job right, acquired employment status and resulting seniority relationship.

We think that all that such a naked contractual attempt by one craft to annex the entire positional field of another craft and so to secure the latter's abolition—as is here reflected by the circumstances of the parties' dealings and the agreement reached, in their relation to the admitted nature of that positional field and the uncontrovertible fact that only its braking duties have been the basis of the craft's 40-year industrial existence and recognition[5]—could properly be regarded as effecting, within the purview and purposes of the Railway Labor Act, and in valid effect generally, would be a merging of the two previously separate but similar crafts and an accompanying assimilation of the members of the consolidated craft into the annexing craft.

If the situation should not be so regarded and treated, then the bald predatory exaction from the Railway of an obligation to deprive the train porters of their positional field and jobs, not constituting a confirmation between the parties of something previously owed or having other proper and mutual dealt-on contractual basis, would be a violation of the fundamental right of the train porters not to be made to lose their jobs and employment through artificial interference on the part of the Brotherhood or anyone else. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131.

There is no contention by the train porters here that a merger of the two previous similar positions and crafts, with a proper recognition of the train porters' existing status and rights, could not validly be made to occur, through an agreement on the

---

5. A recognition also made for many years by the Brotherhood itself. See footnote 4, supra.

part of the Railway with the Brotherhood, such as is here involved. And in so far as the making of such a merger agreement might perhaps otherwise require previous notice by the Railway to the train porters of an intention to make, in order to give it validity under the Railway Labor Act, if such an objection were raised, the train porters do not undertake to interpose any such objection to the validity of the agreement as effecting a mere merger of the two positions and crafts. They are willing that the agreement be allowed to have the normal legal effect of which it would be capable, of having assimilated their positional field and themselves into the brakeman's craft. Also, they recognize that the Brotherhood is entitled to the status of bargaining representative for the merged crafts, by reason of the majorityship in number of its previous membership.

In this situation, it would seem only reasonable and proper that the agreement should be judicially accorded such valid legal effect as it is possible for it to have, in order that the parties involved—the Railway, the Brotherhood and the train porters—all may have the opportunity to enjoy, to as full an extent as possible, the advantages which it is capable of affording to them respectively on that basis. Thus, on the basis of the agreement, the Railway is legally privileged to reduce the kinds of positions and crafts involved in its operations, as against any otherwise possible right of objection, by consolidating the similar positions and crafts of train porter and brakeman into the single one of brakeman, leaving the members of both to occupy the unified positional field on the basis of and in relationship to their previous service status. And the Brotherhood and the brakemen similarly, by virtue of the agreement, will be able to have the position and craft of brakemen enlarged, which they apparently desire, through. absorption of the similar position and craft of train porter, but with the obligation, of course, resting on the Brotherhood, in its capacity of statutory bargaining representative for the consolidated crafts, to protect the minority assimilated-craft membership equally with its own membership, in accordance with the principles of Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173.

█ The Brotherhood naturally would prefer to have the broader advantages, which would accrue to its members from the action which the Railway has attempted to take under the agreement, enjoyed by them as long as possible, rather than the more limited advantages, as referred to above, which the agreement is legally capable of affording them. In an effort thus to hold on to all the advantages which it has undertaken to make the Railway produce for its members from the agreement, both the invalid and the valid ones, for as long a period as possible, it seeks to becloud the plain legal situation to which the agreement of itself gives rise, as set out above, by asserting in effect that the brakemen have other rights, outside and beyond those created by the exacted agreement, to the train porters' positional field, and that this claim of rights should prompt a court of equity to ignore the results which it is undertaking to make the agreement produce, however illegal they may be as a proximate consequence in relation to the agreement alone, until the train porters have assumed the burden of carrying the situation to the Railroad Adjustment Board and have succeeded in getting the brakemen's claim of outside rights disproved. In other words, the Brotherhood asks that, for a period of 2 to 2½ years at least,[6] it be allowed to inflict upon the train porters whatever consequences it is able to do, through the exacted agreement, by loosely calling the entire situation, in its unrelated aspects, a jurisdictional dispute.

---

**6.** We were advised on the argument of the case that under the present congested condition of the Railroad Adjustment Board's docket there would have to be a wait of at least 2 to 2½ years before any hearing could possibly be had before the Board. Thus the controversy involved in Missouri-Kansas-Texas R. Co. v. Randolph, 8 Cir., 164 F.2d 4, in which our opinion was rendered in 1947, and which after some further proceedings was taken before the Board, has apparently not yet been reached for hearing.

In addition to making the agreement serve to disrupt the admitted 40-year positional holding of the train porters, its use to deprive the entire class of their jobs and livelihood would of course also mean that the train porters would be without opportunity for any financial leaning by a part upon the rest in any attempt to vindicate their rights. Again, with the entire class thus thrown out of work, economically weak as it recognizedly is, and with all of the members faced with the need of finding jobs reasonably promptly in order to subsist, it is obvious that but little chance would exist of preserving group solidarity or cohesion—important in any labor struggle—for the period of 2 to 2½ years or more which would be required to obtain administrative vindication. Still further, and repugnant to the basic concept of all labor in any situation, is the fact that the train porters as a labor group, through the use of the agreement to wipe out entirely their employment, position and craft from the Railway, would have been completely disarmed of labor's fundamental and most sacred weapon and the opportunity for its exercise—the power of defensive strike—and this indeed by another labor group itself.

All of this might perhaps be capable of moratory judicial ignoring, if they were in fact incidents deriving from some regular assertion of a colorable claim of rights in a jurisdictional dispute. But when the Brotherhood said to the Railway, as it did in effect, that even though the position of train porter had had existence on the Railway's passenger trains for over 40 years, with its industrially implicit and established underlying basis, the Railway now, without regard to the question of the position's right otherwise to continued existence, would have to abolish it and convert it into a head-end brakeman's position or else the members of the Brotherhood would engage in a strike—and on this basis alone obtained the agreement here involved—it could not be said to have thereby created such possible legal rights as might colorably be claimed in the present situation to give rise to a jurisdictional dispute. The only legal effect, as we have pointed out, which

such a barren exaction, from the circumstances of its making and its terms, could properly be given, would be as a consolidation of the two previously existing but virtually identical positions and crafts, and of the membership of both—and this effect it is being fully accorded.

And so the fact that the Brotherhood here claims that it has other extraneous rights against the train porters as a class, which it is not open to us to examine or determine, does not require that we allow the agreement, not made on the basis of any dealings related to or recognizive of such now-alleged rights, to be used to inflict the consequences which are being sought to be produced by the agreement alone and which when so produced are beyond the legal effect which the agreement as such, on the basis of its making, is entitled to have. Since the agreement itself affords no legal basis for the brakemen to deprive the train porters of their 40-year positional field, their established employment status and their means of livelihood, there is no right to ask to have it given that effect, even for a period of 2 to 2½ years, on the ground that the Brotherhood here claims other nonrelated, excluding rights and on their basis may have a jurisdictional dispute.

Against the consequences to the train porters of discretionarily withholding present equitable relief from such invalid effects as the agreement is being used to produce to the train porters' 40-year existing status, on the possibility that other extraneous rights capable ultimately of producing a similar result might perhaps exist, stands the consideration that the brakemen, with the invalid effects of the agreement judicially restrained, will occupy no different position as to enjoyment or assertion of their claimed extraneous rights than they have had at any time since the Railway Labor Act was enacted. Their extraneous rights, they say, rest on a so-called "schedule" or agreement, which antedates the passage of the Railway Labor Act, and yet, in the many years that have elapsed since the Act went into effect, they have apparently been unwilling to take any steps themselves to have an administrative determination or establishment made of

such alleged rights. What they now argue is that the train porters should be made to assume the burden of disproving these alleged extraneous rights, before a court of equity should undertake to give any protection against the consequences of their legally unrelated agreement.

We would not want to prejudice in any way these alleged extraneous rights, if they exist, and indeed we shall go so far as not to allow them even to be prejudiced by the legal effect of the exacted agreement, if they are successfully established. We shall assiduously avoid hampering or preventing the proper assertion or vindication of them. In the decree which will be entered herein, appropriate steps therefore will be taken to leave open the opportunity for safeguarding to them any victory as to their extraneous rights which they may succeed in establishing and to which they would be legally entitled, under the provisions of the Railway Labor Act.

On the basis of what has been said, the trial court's refusal to consider the exacted agreement and its use in relationship to the train porters' status and rights, as constituting an attempted predatory appropriation thereof, except as a consolidation of the two positions, crafts and memberships, is reversed, and the cause is remanded with directions to enter an order of permanent injunction enjoining the Railway and the Brotherhood from using the agreement for any other purpose and from giving it any other effect than as accomplishing a consolidation of the positions and crafts of brakeman and train porter and of the membership of the two crafts, with the Railway being required to accord proper recognition to the service status or seniority of each in relation to the others, and with the Brotherhood being required to assume the responsibility as statutory bargaining representative of the merged crafts of protecting the former train porters in their individual and class rights equally with its own members—the foregoing prohibition, however, to be subject to the following protective reservations: (1) The injunction shall not operate in any way to prevent the Brotherhood and the brakemen as previously existing from taking steps to assert and vindi-

cate their claimed extraneous rights before the Railroad Adjustment Board or from availing themselves of any other proper means open to them under the Railway Labor Act for securing recognition of such alleged previous rights, but only in this respect shall the Brotherhood be relieved of its obligation meanwhile as statutory bargaining representative to look after the interest of the merged train porters; and (2) jurisdiction shall be reserved by the District Court in relation to the injunction issued to enable the injunction to be set aside or modified in its further operativeness, in case the alleged previous rights are so established that the existence of the injunction thereafter might serve to prevent the according to them of their proper legal effect.

Other questions have been argued which, on the disposition here made, it is unnecessary to discuss, except to say on the cross-appeal taken by the Railway from the holding of the trial court that the notice given to the train porters, in the attempted abolition of their position and termination of their employment as of April 1, 1946, was in any event invalid, as not satisfying the requirement of the Railway Labor Act, 45 U.S.C.A. § 156, for the giving of at least 30 days notice of any intended change in agreements affecting working conditions, that this holding is entitled to be affirmed. The Railway's argued interpretation of the notice requirement of the Act is too refined and unrealistic to require comment.

We should perhaps also add the observation that the disposition which we have made on the merits has been on the basis of the particular facts and their analysis, with the legal situation resulting therefrom, and we shall therefore not engage in any unnecessary distinction of the cases which the Railway and the Brotherhood have cited.

The decree of the trial court is affirmed with respect to the invalidity of the notice given to the train porters. In all other respects it is reversed, and the cause is remanded with directions to enter an injunctive order in conformity with this opinion.