**UNITED STATES of America,**
**Appellant,**

v.

**ST. LOUIS–SAN FRANCISCO RAIL-**
**WAY COMPANY and United Transpor-**
**tation Union, Successor to Brotherhood**
**of Railroad Trainmen, Appellees.**

**No. 71–1247.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 8, 1972.

Decided June 13, 1972.

Matthes, Chief Judge, and Lay, Heaney, and Bright, Circuit Judges, concurred; Heaney and Lay, Circuit Judges, concurred in part and dissented in part; Stephenson, Circuit Judge, Van Oosterhout, Senior Circuit Judge, and Mehaffy, Circuit Judge, dissented.

---

Robert T. Moore, Atty., Dept. of Justice, Washington, D. C., for the United States.

Paul R. Moody, St. Louis, Mo., for appellee, Railway.

Charles R. Judge, St. Louis, Mo., for appellee, United Transportation Union.

Before MATTHES, Chief Judge, and VAN OOSTERHOUT, MEHAFFY, LAY, HEANEY, BRIGHT, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

This is an action brought by the United States charging St. Louis-San Francisco Railway Company (Frisco) and United Transportation Union (UTU), successor to the Brotherhood of Railroad Trainmen (BRT), with having engaged in a policy and practice of discrimination on account of race, in their dealings with black train porters formerly employed by Frisco, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.).[1] The Government seeks to have Frisco reclassify the former train porters as brakemen, and, by a merger of these two crafts, allow them to claim seniority accumulated as train porters in their new classification.

The trial court denied the request of the Government for a merger of the crafts and dismissed the action. United States by Clark v. St. Louis-San Francisco Railway Co., 52 F.R.D. 276 (E.D. Mo.1971). On appeal to this Court, a majority of the panel, which heard the case, affirmed on the basis of the opinion of the trial court. United States v. St. Louis-San Francisco Railway Co., No. 71-1247 (8th Cir. Feb. 22, 1972). The United States filed a petition for rehearing *en banc,* and it was granted. Upon rehearing *en banc,* we reverse and remand for further proceedings consistent with the views expressed in this opinion.

The essence of the claim of the United States is that from 1928 to 1966 Frisco discriminated against blacks in its hiring practices relating to brakemen; that black applicants for jobs with Frisco were forced to accept the lower paying job of train porter; that train porters performed head-end braking duties as well as duties relating to passenger care and maintenance on passenger trains; that when passenger trains were discontinued by Frisco, passenger brakemen

---

1. This is the latest in a series of cases involving essentially the same parties. Howard v. Thompson, 72 F.Supp. 695 (E.D.Mo.1947), rev'd, 191 F.2d 442 (8 Cir. 1951), aff'd, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Howard v. St. Louis-San Francisco Railway Co., 215 F.2d 690 (8 Cir. 1954); Howard v. St. Louis-San Francisco Railway Co., 244 F.Supp. 1008 (E.D.Mo.1965), aff'd, 361 F.2d 905 (8 Cir.), cert. denied, 385 U.S. 986, 87 S.Ct. 598, 17 L.Ed.2d 448 (1966). However, this is the first action instituted subsequent to the enactment of the Civil Rights Act of 1964. Moreover, it is the first case to consider the distinction between the duties of the train porter and the *freight* brakeman.

were allowed to carry over all of their seniority to freight braking jobs; that even though train porters performed braking duties a substantial portion of the time they spent as train porters, they were not permitted to carry over any seniority to freight braking, but were required to start at the bottom of the seniority ladder; and that this denial of carryover seniority was a present discriminatory effect of past discrimination, preserved by an otherwise neutral current employment policy, which should be remedied under the Civil Rights Act of 1964.

The craft of train porter [2] had been recognized by Frisco since at least December, 1918; and it had been organized and represented for collective bargaining purposes since 1921.[3] It had always been filled solely by blacks, and the black train porters were always paid lower wages than brakemen, except for a period during and shortly after World War I, when the railroads were under federal control and the crafts of train porter and brakeman were merged. Train porters and brakemen were always represented by separate bargaining units.

In 1928, Frisco and the BRT, which represented the brakemen, negotiated a collective bargaining agreement, which provided that "in the future hiring of employees in train, engine, and yard service but not including Train Porters, only white men shall be employed." [4] Although this agreement was rescinded in 1949, no black person was hired as a brakeman until 1966, with one exception.[5] Yet, during this period from 1949 until 1965, at least 750 white brakemen were employed by Frisco at the entry level. From 1966 until June, 1970, 63 black brakemen and switchmen were hired.[6]

Train porters assisted passengers, handled baggage, kept coaches clean, and performed head-end braking duties exclusively on passenger trains. The rear-end braking duties on the passenger train, as well as braking duties on both ends of freight trains, were performed by brakemen. The Government insists that throughout the period in question, train porters were relegated to that craft simply because of their race, and that this is borne out by the fact they per-

2. Train porters should not be confused with chair car porters, who were paid less and whose job included no braking duties.

3. Howard v. St. Louis-San Francisco Railway Co., *supra*, 361 F.2d at 907. In this litigation, Frisco presented evidence to show that some train porters had entered service as early as 1884.

4. The depositions taken from those black train porters who initiated their employment during the period this provision was in force attest to the fact that it was applied strictly on racial grounds. Train porter Edwards, who apparently asked for a brakeman's job shortly after the contract was initiated, was told that he could not be hired as a brakeman. Adams, who in 1936 applied for a trainman job on the front end of a passenger train, stated that he did not apply for a brakeman's job because he was told that as a Negro he could not have been hired. And Nichols, Tennon, and Falls, all of whom applied for jobs as train porters in 1942, did so because they knew that Frisco was not hiring

blacks as brakemen. Nichols specifically stated that he would have preferred a job as brakeman.

5. The one exception was train porter Pogue, who applied for and was accepted as a fireman in 1963. When that position was eliminated, Pogue exercised his seniority as a train porter, and continued in that capacity until April, 1964, at which time he applied for and was accepted as a brakeman. However, after one student trip, he elected to revert to train porter, in which capacity he continued until passenger service was discontinued in 1967. At that time, he reapplied for and was again accepted as a brakeman.

6. A listing of these individuals was tendered by Frisco on June 5, 1970, in response to an interrogatory by the Government requesting the name, present job, and date of initial employment of each Negro who was employed as a "brakeman, conductor, switchman or switchman-foreman by the defendant Frisco."

formed essentially the same functions as the passenger brakeman.

Evidence given by individuals who had been train porters with Frisco revealed that their braking duties consisted of flagging blocks, throwing switches, watching for and repairing "hot boxes," setting out and picking up cars, setting and unsetting hand brakes, replacing broken knuckles (train couplings), coupling and uncoupling air and steam hoses, giving hand signals, using and maintaining lanterns, fusees, and other signaling equipment, receiving and carrying out orders, and otherwise assisting the conductor. Witnesses for the defendants acknowledged that the train porters did in fact perform these duties. There is, however, disagreement as to what percentage these braking duties assumed in the train porter's total work shift;[7] the trial court found that the train porter's "primary" duty was to assist and care for the train passenger.[8]

Regardless of what was considered the train porter's primary duty, Frisco and UTU argue that the braking duties performed by train porters were significantly different from those performed by freight brakemen, and that on this basis there exists a functional distinction. The duties of freight brakeman include working in local freight, yard switching, and through freight, which involves "kicking" and "dropping" cars, where a car, moving under its own momentum, is controlled by the brakeman using a handbrake. A freight brakeman is also responsible for loading and unloading goods, switching, inspecting for equipment failures, and making necessary repairs. Many of these jobs involve long shifts, under hazardous conditions and in all types of weather. Some of the train porters stated, in their depositions, that they observed these freight duties while deadheading (riding to or from their starting or termination point) on freights, and that thereby they were acquainted with most of the duties.

Although a brakeman had a right to bid on any job, the usual progression was through the more dangerous and arduous freight service to the easier, high-priority passenger service, where the majority of the brakeman's time was spent riding. The entry level of the brakeman's craft is yard work. From there a brakeman generally progresses through local freight, through freight,

---

7. In 1951, Judge Johnsen, writing for the Court in Howard v. St. Louis-San Francisco Ry. Co., 191 F.2d 442, 444 (8th Cir. 1951), aff'd, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), found that their duties in aisle-sweeping and passenger-assisting were merely incidental, occupying only approximately five percent of their time. He found that "it is plain that the position of train porter has had existence only because of the braking duties attached to it and that only because it has made unnecessary the establishing of a head-end brakeman's position on such trains has it had a 40-year survival. . . ." Many of the train porters, in this case, stated in their depositions that they felt ninety-five percent of their duties consisted of braking duties. Defense witnesses, including one black brakeman who was formerly a train porter, indicated that braking duties occupied only ten percent to twenty percent of the train porter's time. And one Government witness, Nathaniel Adams, indicated that forty percent of the train por-

ter's duties related to baggage handling, maintenance and passenger care.

8. The trial court summarized the duties of a train porter, from the deposition of a former train porter, as follows: "Looked after and checked on the lighting, heating and air-conditioning on passenger trains; kept up the general appearance of the passenger coaches by picking up debris, bottles, cups, and sweeping the aisles and under the seats; assisted passengers boarding and departing from trains; helped passengers with their baggage, called out train stations, advised them with respect to making connections, and answered any remaining questions the passengers might have; picked up hatchecks for the passengers; sold pillows to the passengers; kept the restroom on the passenger trains clean; and checked for items the passengers may have left behind after the passengers departed the train." United States by Clark v. St. Louis-San Francisco Railway Co., supra, 52 F.R.D. at 281.

and finally he will then bid on a position as conductor or, prior to 1967, as a rear-end brakeman on passenger trains. There is, however, no set job progression; if a brakeman had so elected, prior to 1967, he could have remained in yard work or local freight until he accumulated enough seniority to become a conductor or a passenger brakeman. By union contract, the assignment of all brakemen was done through bidding, based upon seniority as a brakeman. When a brakeman became a conductor he retained his seniority as a brakeman in case he wanted to give up his conductor classification and return to braking.

Passenger service was discontinued by Frisco in 1967. Consequently, the position of train porter was abolished and all of the black train porters were displaced.[9] Frisco did, however, offer those train porters, who were still in service and who did not choose to retire, positions in other crafts; but less than half of that number accepted, because none were allowed to retain any of the seniority they had acquired as train porters.

After consideration of these facts, the trial judge dismissed the action and entered judgment for the defendants upon two basic findings. First, he concluded that the crafts of train porter and brakeman were distinct in that they were based upon functional differentiations, and that thereby train porters were not qualified to perform as freight brakemen. This finding was based upon testimony by defendants' witnesses that the train porter's primary function was that of looking after passengers, and that any braking was merely incidental. Second, he specifically found that the train porters had not been discriminated against since the enactment of the Civil Rights Act of 1964, and that therefore, no remedy was justified. He found that

the train porters had been accorded adequate relief in the form of an offer of job preference as brakeman, but without carryover seniority, and that this was the only affirmative relief possible to remove the taint of past racial discrimination.

A majority of the original panel, of this Court, in affirming the trial court's decision on the basis of his opinion, stressed the applicability of the "business necessity" doctrine and that seniority carryover could occur only at the expense of safety and efficiency. On rehearing, neither the Government nor the defendants suggested any new alternative remedies that would adequately protect safety and efficiency and, at the same time, relieve the train porters of the continuing effects of past discrimination. The alternative recommended by the Government, which was urged by it and considered by the panel earlier, would accord qualified train porters full seniority carryover in bidding on future vacancies as brakemen. Thus, the only difference in that remedy from a complete merger of crafts is that there could be no displacement of incumbent brakemen; rather, advancement would be possible only when a vacancy occurs. The net long term effect of both, however, is the same.

■ We are convinced that a remedy is justified and that it is not impossible to fashion. First of all, it is clear there was overt racial discrimination prior to the enactment of the Civil Rights Act of 1964, and that the continuing effect of that past discrimination perpetuates itself in Frisco's refusal to accord the train porters any seniority. Second, the business necessity doctrine does not bar relief where an acceptable remedy provides adequate safeguards for safety and efficiency. And third, there is an acceptable remedy in this case.

9. As of July 2, 1965, the effective date of Title VII of the Civil Rights Act of 1964, there were fifty-six train porters listed on nine different rosters, which rosters were made up for each of the geographic subdivisions of Frisco. Of this number, four had retired pursuant to the disability provision of the Railroad Retirement Act. Thus, the Government now claims that the class of train porters entitled to relief consists of fifty-two.

## PRESENT EFFECTS OF PAST DISCRIMINATION

The facts disclosed by the record in this case, as set forth above, lead us to the inescapable conclusion that Frisco systematically discriminated against blacks in hiring new brakemen from 1928 until 1966. During the first twenty-one years of that period, a written agreement existed between Frisco and the BRT which absolutely precluded the hiring of black brakemen by Frisco. From 1949 to 1966, out of over 750 newly hired brakemen, only one was black. Although the record does not contain specific evidence of the refusal of Frisco to hire blacks during this period subsequent to the rescission of the restrictive agreement in 1949, these statistics demonstrate just as effectively as the testimony of a witness that Frisco and the BRT systematically excluded blacks in hiring new brakemen. *See* Arkansas Education Association v. Board of Education, 446 F.2d 763, 770 n. 4 (8th Cir. 1971); Bing v. Roadway Express, Inc., 444 F.2d 687, 689 (5th Cir. 1971); Marquez v. Omaha District Sales Office, Ford Division of Ford Motor Co., 440 F.2d 1157, 1160–1161 (8th Cir. 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970); United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 416 F.2d 123, 127 n. 7 (8th Cir. 1969). This conclusion is further strengthened by the disclosure that sixty-three blacks were hired as brakemen from 1966 to 1970, including at least five former porters. Obviously the passage of the Civil Rights Act of 1964 had an effect on the hiring practices of Frisco and the acceptance of those revised hiring practices by the BRT.

Even though Frisco adopted nondiscriminatory employment practices after the effective date of Title VII of the Civil Rights Act of 1964, the effects of its past discrimination carried over under the craft seniority system, especially after the discontinuance of its passenger service in 1967. At that time, the white brakemen on passenger trains were able to use their seniority accumulated in passenger service to bid on vacancies in freight service. But the black train porters were not permitted to transfer any portion of their seniority to any other craft, and were only offered jobs in other crafts starting at the bottom of the seniority ladder. Thus, for example, even though a train porter had thirty years of experience, including substantial experience performing head-end braking duties on passenger trains. he was offered a position as a brakeman junior in seniority to all other brakemen, including those who might have been hired only a few weeks earlier.

This discrimination was evident not only in the rehiring procedure offered by Frisco, but was bound to continue until the death or retirement of all of the black train porters who were transferring to brakeman. "Every time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias." Local 189, United Papermakers and Paperworkers v. United States by Mitchell, 416 F.2d 980, 988 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). Where an employer's current policy serves to perpetuate the effects of past discrimination, "although neutral on its face, it rejuvenates the past discrimination in both fact and law regardless of present good faith." Marquez v. Omaha District Sales Office, Ford Division of Ford Motor Co., *supra*, 440 F.2d at 1160; *see* Parham v. Southwestern Bell Telephone Co., *supra*, 433 F.2d at 427. Therefore, "[u]nder the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Barriers to employment or advancement

which are artificial, arbitrary and unnecessary, and cannot be justified by a showing of business necessity, must be removed where they "operate invidiously to discriminate on the basis of racial or other impermissible classification." *Id.* at 431, 91 S.Ct. at 853.

The conclusion is thus inescapable that there was past discrimination by Frisco and by UTU, and its predecessor, BRT, both by contract and in practice; that the discontinuance of passenger trains by Frisco, and its refusal (or inability) to permit the train porters to carry over any part of their seniority, perpetuated that discrimination even though Frisco changed its hiring practices relating to new employees; and that this perpetuation of the effects of this past discrimination cannot be permitted to continue absent a showing of compelling business necessity.

## BUSINESS NECESSITY

"The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853.

■■ It is likewise apparent that a neutral policy, which is inherently discriminatory, may be valid if it has overriding business justification. Jones v. Lee Way Motor Freight, Inc., *supra*, 431 F.2d at 249; *see also*, Local 189, United Papermakers and Paperworkers v. United States, *supra*, 416 F.2d at 989. However, this doctrine of business necessity, which has arisen as an exception to the amenability of discriminatory practices, "connotes an irresistible demand." The system in question must not only *foster* safety and efficiency, but must be *essential* to that goal. United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). In other words, there must be no acceptable alternative that will accomplish that goal "equally well with a lesser differential racial impact." Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *accord*, United States v. Bethlehem Steel Corp., *supra*, 446 F.2d at 662.

Although Frisco and UTU argue strenuously that the train porters should not be permitted to carry over their seniority in bidding on braking jobs for safety reasons, we are not convinced that this argument is necessarily valid. Those train porters who did transfer to duties as brakemen, without seniority, were not given any special training. Their student runs were waived, and if they were able to pass the physical examination, they started right out on their new freight braking duties. Frisco conceded on oral argument that they were performing these duties satisfactorily.

As already noted, the train porters performed many braking functions while working as porters. There are some duties which are performed by freight brakemen that were not performed by the train porters. However, there was testimony that while deadheading on freights, the train porters had an opportunity to observe the freight brakemen in the performance of these duties, so they have at least had the opportunity to learn by observation; and there is nothing in the record to indicate that the train porters are incapable of learning these additional duties if Frisco offers them adequate training.

At the present time, Frisco has no "line of progression." It is not necessary for a brakeman to perform one type of braking service prior to bidding on another type, if he has enough total seniority as a brakeman. Conceivably, a brakeman can go right from braking in the yards to through freight work, if he is willing to work long enough in the yards before bidding on through freight. After completion of the initial student

runs, and after passing the brakeman's examination, seniority takes over as the sole criteria in bidding on a particular braking assignment. Length of service becomes synonymous with qualified. This craft seniority system, as applied to the facts of this case, perpetuates racial disparity; and it cannot be justified on the basis of business necessity, since there exists a nondiscriminatory alternative means of determining qualifications.

> "The Act imposes upon employers—with the assistance and cooperation of labor representatives—an affirmative duty to devise and implement pertinent objective criteria for determining what applicants for promotion or transfer are qualified to fill particular vacancies." United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 453.

■■ It is true that Frisco could not have permitted a transfer of train porter seniority to the brakemen's roster without breaching its agreement with UTU, but "[t]he rights assured by Title VII are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interests of minority employees." Robinson v. Lorillard Corp., *supra*, 444 F.2d at 799; *see also*, United States v. Hayes International Corp., 456 F.2d 112, 117, 118 (5th Cir. 1972); United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 454–455. The UTU is not immune from the duties imposed by Title VII; it is a party to this action, and it will have to accommodate itself to revisions in its contracts and its rules and regulations which may be necessary to assure compliance with the Act.

■ Frisco's abdication, to the union, of control over the qualifications of its brakemen to perform particular braking duties, cannot now be used as a reason for denying fair treatment to the train porters under the guise of safety. Safety can be assured in other ways far more certain and practical than those inherent in the craft seniority system, and we feel confident that the trial court, acting within the general guidelines provided herein, will be able to fashion a remedy which will not only assure the safety of the public and employees of Frisco, but will also accord to qualified train porters their "rightful place" as brakemen.

## REMEDY

■ In determining an appropriate remedy, courts possess wide discretion in fashioning decrees to insure compliance with the Civil Rights Act of 1964. Parham v. Southwestern Bell Telephone Co., *supra*, 433 F.2d at 428; *see* United States v. Ironworkers Local 86, 443 F.2d 544, 553 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). What we seek, of course, is a reasonable alternative that will eliminate or reduce the effects of past discrimination, as well as protect safety and efficiency.

The Government seeks a complete merger of the crafts, or in the alternative to require Frisco to permit qualified black train porters to bid on future vacancies in freight braking jobs as they become available, and to exercise in those jobs their total company seniority for all future purposes for which resort to seniority would customarily be made. This alternative remedy has been referred to as "rightful place" relief, while the complete and immediate merger of crafts has been referred to as "freedom now" relief. *See* Note, Title VII, Seniority Discrimination, and the Incumbent Negro., 80 Harv.L.Rev. 1260, 1268–1269 (1967). The Government also seeks back pay equal to

> "the difference between what the member of the class received as a Train Porter, or from other employment if his position as Train Porter had been abolished, and what he would have received as a Brakeman, from July 2, 1965 to such time as he is allowed to use his Train Porter seniority to bid on and secure a job as a freight Brakeman (or until the date

he voluntarily retired or became physically unable to perform as Brakeman)."

Frisco and UTU urge that no relief be granted, and have suggested no alternative remedies even though they were specifically requested to do so by this Court.

At its earliest convenience, the trial court shall determine the ambit of the class,[10] and take additional evidence pertaining solely to the remedy to be fashioned. Based upon that additional evidence, and using the guidelines hereinafter set forth, the trial court shall then fashion a remedy which will accord the train porters their "rightful place" as Frisco brakemen, while making certain Frisco will not be required to hire or assign any former train porter who is not physically able, or not qualified, to perform the braking job to which he seeks to be assigned.

The general guidelines to be used in fashioning this remedy are as follows:

I. Frisco must offer to employ all of the former train porters as brakemen within six months from the date the trial court's decision becomes final. The trial court shall determine or approve the means by which the train porters are notified of their right to employment as brakemen and the means by which they must accept.[11] Frisco may be permitted to offer all of the jobs at one time or as vacancies become available, in which event offers shall be made in the order of the porter's accumulated train porter seniority. No other new brakemen may be hired during this period, until after all former train porters have been given the opportunity to return to work as brakemen. Each former train porter must pass the physical examination presently being given to brakemen of the same age. And if any former train porter declines the offer to return to work as a brakeman, when offered, fails to report for work within a reasonable time after accepting the offer, or fails the physical examination, he shall forfeit all right to return to work as a brakeman.

II. Frisco shall create and implement a training program for former train porters and make every reasonable effort to train them to perform those braking functions which they will be required to perform, on jobs they will be entitled to bid into and hold, after applying the seniority carryover hereinafter specified. Former train porters presently employed as brakemen by Frisco shall not be required to participate in this training program.

A. Frisco shall provide such instructive and safety related training as is necessary and reasonable under the circumstances for a period to be determined by the trial court, but in any event it shall not exceed six months from the date the former train porter enters into service. Upon the completion of that training program, Frisco shall determine, using reasonable, safety related, objective standards, which shall be subject to the approval of the trial court, whether or not the former train porter is qualified [12] to be a brakeman, and if

---

10. The court shall determine which of the fifty-two train porters, *supra* n. 6, are entitled to affirmative relief in accordance with this decision. It shall not automatically exclude those train porters who had been furloughed by Frisco prior to July 1, 1965, but remained on the train porter seniority roster.

11. For example, all train porters may be notified and required to express interest within a reasonable set period. *See* United States v. Central Motor Lines, Inc., 338 F.Supp. 532, 562 (W.D.N.C. 1971).

12. It should be remembered that "qualifications" means the capacity to perform rather than the possession of "immediately marketable skills." Gould, Seniority and the Black Worker: Reflections on Quarles and Its Implications, 47 Tex.L.Rev. 1039, 1054 (1969). A screening process could be created by which these qualifications are determined and those bidding into particular jobs are evaluated. *See e. g.*, United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 459.

so whether there is any particular type of braking duty which the former train porter should not perform for safety reasons. During this training period, the former train porters shall be paid on the same scale as newly hired brakemen, and they may not use the carryover seniority hereinafter specified in bidding on assignments.

B. If, after completion of the training program, a former train porter is determined to be completely unqualified, he shall not be entitled to carry over any past seniority credit, and he shall be subject to all contracts and rules presently in effect, giving the company the right to terminate the services of unqualified brakemen. Until such time as all former train porters, who accept the offer to return to work and pass their physical examination, have completed their training and have been determined to be qualified or unqualified, the same rules relating to training and determination of qualifications shall be applied to all newly hired brakemen as are applied to the former train porters. Once the training program for former train porters has been completed, Frisco may abandon this training program.

III. Once the training program of a former train porter has been completed, and he has been determined to be qualified, or qualified for certain assignments but not others, that former porter shall be entitled to seniority credit as a brakeman for 100% of the time spent in training plus 50% of his former seniority as a train porter.[13] Former train porters presently in service as brakemen shall be entitled to seniority credit as brakemen for 100% of the time they have spent as brakemen plus 50% of their former seniority as train porters. This seniority may then be used for all purposes for which brakeman seniority is presently used, except it shall not be used to force Frisco to assign a former train porter to a job for which he has been properly determined to be unqualified, and it shall not be used to force Frisco to assign more than one former train porter to any one crew.

IV. No back pay will be awarded. In reaching this decision, we have taken into consideration the fact that the train porters (and the Government) took the position that a complete merger of the two crafts was required with full seniority carryover. Since this demand has been denied by this Court, it cannot be said that Frisco acted in bad faith or erred in refusing to voluntarily grant that request. Moreover, it would be impossible to determine on what date those train porters who are now physically unqualified to become brakemen, became physically unable to perform.

Reversed and remanded for further proceedings consistent with this opinion.

MATTHES, Chief Judge, with whom LAY, HEANEY, and BRIGHT, Circuit Judges, join, concurring.

After careful deliberation, I feel constrained to join the opinion of the Court. However, in doing so, I state some of my views separately.

First, the record in this case amply demonstrates that prior to the effective date of the Act, appellees maintained racially discriminatory hiring practices. This is established not only by the well settled legal principle that statistical evi-

---

13. The figure of 50% carryover seniority takes into consideration: a) the percentage of time spent by the train porters in performing braking duties, and the disputed testimony relating thereto; b) the fact that some train porters may have preferred the work of train porter to the work of a brakeman; and c) the fact that blacks were illegally denied the right to become brakemen from 1928 until 1966. No mathematical equation is possible in such circumstances, and this Court has reached this figure in an effort to accord the former train porters their "rightful place" on the brakeman's seniority roster once they have been found to be qualified to be brakemen. *See e. g.,* Carter v. Gallagher, 452 F.2d 315, 331 (8th Cir.) cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972), where this Court also adopted a percentage type remedy.

dence of racially imbalanced hiring proves discrimination, but also by the evidence that appellees contractually agreed to hire only white applicants and that black applicants were either refused employment because of their race or applied only to be porters because of this hiring policy. *See* footnote four of the majority opinion.

Second, Frisco's present seniority system violates Title VII by perpetuating the vestiges of these discriminatory hiring practices. Blacks have no seniority as brakemen largely because they were denied jobs as brakemen due to their race.

Third, a violation of the Act having been shown, the porters are affirmatively entitled to some form of relief. The only question remaining for decision is what, if any, remedy is appropriate.

I agree with the Court that merger is not an appropriate remedy in this case. Were the porter and brakemen crafts functionally identical as were those local unions which various courts have merged, this remedy might be appropriate. But since the crafts are not functionally identical, the Court cannot assume that *all* porters are qualified to be brakemen. Hence, the defense of "business necessity," which in this case means safety of co-workers and the general public, precludes an order that Frisco merge the crafts and thereby hire all porters at whatever job their accumulated seniority would warrant.

Conversely, I cannot agree with the District Court that the only possible remedy in this case is that which Frisco has voluntarily undertaken, to wit: giving porters preference in hiring as brakemen, but denying them all seniority. Since it is the denial of seniority which constitutes the violation, that view implicitly concludes that no remedy is here possible because *no* porter is capable of handling *any* brakemen job above the entry level. However, that conclusion is rebutted by the record in this case. Frisco concedes it has absolutely no criteria which limit promotions to qualifications. Thus, a brakeman who

prefers the regular hours of yard work can pass up intermediate jobs and after accumulating seniority can "leapfrog" to rearend brakeman or conductor on through-freights. Similarly, Frisco concedes that the porters it has hired are adequately performing their duties despite the fact that due to their lack of seniority they are relegated to the most difficult and dangerous work. Consequently, I cannot say "business necessity" requires stripping all porters of all seniority.

Furthermore, I think a remedy fashioned within the guidelines enumerated in the majority opinion will adequately and equitably remedy the violation. By requiring preferential hiring and some training, the Court remedies the lack of jobs and lack of experience which resulted from the discriminatory hiring. By allowing Frisco to limit porters' job-range upon objective criteria and to limit former porters to one per crew, the business necessity consideration of safety should be adequately satisfied.

Finally, I am unpersuaded by the reverse discrimination argument in this case. While the Act prohibits giving any racial preference, it expressly permits requiring affirmative remedial action. 42 U.S.C. § 2000e–5(g). The Court's remedy conforms to that mandate. Contrary to the District Court's conclusion, the porters are to be granted carryover seniority not "because of the color of their skin," but because they have heretofore been denied seniority because of the color of their skin. If that affirmative relief works to frustrate the seniority expectations of some incumbent brakemen, it will only be frustrating expectations which would not exist but for the discrimination which is finally being redressed. United States v. Bethlehem Steel Corp., 446 F.2d 652, 663 (2nd Cir. 1971). In the final analysis, allegations of reverse discrimination contend only that the hardships accruing from past wrongs should continue to fall exclusively upon those already discriminated against. The answer to that contention is self-evident.

I concur in the judgment and opinion of the Court.

HEANEY, Circuit Judge, with whom LAY, Circuit Judge, joins, concurring in part and dissenting in part.

We concur in Sections I, II, and III of the majority opinion, and with all of Section IV thereof, except that portion relating to back pay. In our view, the District Court should be required, on remand, to fix damages for those porters who suffered loss of earnings because of the discriminatory activities complained of.

Back pay as a form of relief is specifically authorized by Section 706(g) of Title VII. Courts have commonly awarded back pay.[1] While Section 706(g) gives the District Court discretion in fashioning relief, Congress clearly intended that the authority to award back pay "should be broadly read and applied so as to effectively terminate the practice and make its victims whole." Bowe v. Colgate-Palmolive Company, 416 F.2d 711, 721 (7th Cir. 1969). The interpretative memorandum on Title VII prepared by Senators Clark and Case, 110 Cong.Rec. 7212 (1964), explicitly states that Title VII remedies are to include familiar N.L.R.A. remedies including back pay. In light of the frequency with which back pay awards are approved in labor cases, this legislative declaration should not be taken lightly.

The majority opinion states that the porters should be denied back pay because the company did not act in bad faith. But good faith should make no difference, since "back pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice." Robinson v. Lorillard Corporation, 444 F.2d 791, 804 (4th Cir.), dismissed pursuant to Rule 60, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

Furthermore, back pay should not be denied because it is difficult to compute the sum that each porter is entitled to. District Courts have commonly been called upon to perform equally difficult tasks which they have carried out wisely.

STEPHENSON, Circuit Judge, with whom VAN OOSTERHOUT, Senior Circuit Judge and MEHAFFY, Circuit Judge, join dissenting.

We would affirm on the basis of Judge Harper's well-considered opinion which is reported at 52 F.R.D. 276 (E.D.Mo. 1971.) We are satisfied that the trial court's findings of fact are supported by substantial evidence and that the law has been correctly applied.

Neither the anti-preference section (§ 2000e–2(j)) nor the provision safeguarding seniority systems (§ 2000e–2 (h)) operate to prevent courts from eliminating present discriminatory effects of past discrimination which is preserved through the use of neutral employment policies. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Bethlehem Steel Corp., 446 F.2d 652 (CA2 1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (CA8 1970); United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 416 F.2d 123 (CA8 1969) and Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States, 416 F.2d 980 (CA5 1969) See Note, Title VII, Seniority Discrimination And The Incumbent Negro, 80 Harv.L.Rev. 1260 (1967). It is equally clear, however, that courts,

---

1. *See*, Sprogis v. United Air Lines, Inc., 444 F.2d 1194 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); Robinson v. Lorillard Corporation, 444 F.2d 791 (4th Cir.), dismissed pursuant to Rule 60, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). *See, e. g.,* Tidwell v. American Oil Company, 332 F.Supp. 424 (D.Utah 1971).; Fillinger v. East Ohio Gas Co., 4 E.P.D. ¶7618 (N.D.Ohio, Aug. 17, 1971); U. S. v. Lathers, Local 46, 3 E.P.D. 6833 (S.D.N.Y.1971); Gregory v. Litton Systems, Inc., 316 F.Supp. 401 (C.D.Cal.1970); Pettway v. American Cast Iron Pipe Co., 332 F.Supp. 811 (N.D.Ala., 1970).

with their broad authority to fashion remedies under the Act should not emasculate valid seniority systems so long as they are conceived out of *business necessity* and not out of racial discrimination. *Local 189, supra,* at 989, 993–994; Whitfield v. United Steelworkers of America, Local 2708, 263 F.2d 546 (CA5 1959) and United States by Clark v. H. K. Porter Co., 296 F.Supp. 40, 66–68 (N.D.Ala.1968). See Note, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109 (1971); Kovarsky, Current Remedies for the Discriminatory Effects of Seniority Agreements, 24 Vand.L.Rev. 683 (1971) and Yeager, The "Unqualified" Minority Worker, 59 Geo.L.J. 1265 (1971). *Cf. Griggs, supra.*

A careful review of the record convinces us the findings of the district court preclude reclassification of the train porters as freight brakemen with carry-over seniority. Not only is there a functional difference between the crafts of train porters and brakemen, but Frisco's seniority system is based on a recognition that a brakeman's job is complex and hazardous, requiring related experience in safety and repair work at the various levels of job progression. Reclassification with carry-over seniority, under these circumstances, could occur only at the expense of safety and efficiency.[1]

Litigation involving the train porters and their economic status has been before this Court almost continuously since 1946.[2] A review of this litigation discloses that although these blacks and their predecessors were originally locked into the train porter craft by joint Frisco-Union discriminatory practices, their plight in the last two decades has been predominantly economic in origin. The advent of the diesel engine, the dramatic decline of the railroad industry and the elimination of passenger service in 1967 all have combined to wreak havoc upon train porters, rendering them virtually an extinct occupational species.

The majority opinion in effect directs a merger of the crafts, albeit the results of a complete merger are tempered by "minimum qualifications" and "50% seniority." This remedy destroys a valid seniority system based on functional distinctions, a result which appears to us is not contemplated by the Act. In addition it obviously creates a climate for endless litigation.

VAN OOSTERHOUT, Senior Circuit Judge (dissenting).

I dissent from the majority opinion upon all issues except the determination at division IV which holds that no back pay will be awarded. I base my dissent on the dissenting opinion prepared by Judge Stephenson and upon the following additional observations.

Judge Harper points out at pp. 284–285 of 52 F.R.D. that Frisco's employees, by reason of the diesel engine and other technology advancements and the discontinuance of passenger and other services, have been reduced from 28,000 to 8,000, and that many employees have suffered from the decline of employment. He properly determined that Negro train porters have not been discriminated against since the enactment of the Civil Rights Act and that the elimination of their jobs was caused by the authorized termination of passenger service. See Howard v. St. Louis-San Francisco Ry. Co., 8 Cir., 361 F.2d 905, 907–908.

Judge Harper appropriately observes:

"If this court were to grant the proposed relief, it would place the Negro train porters in a favored position only because of the color of their skin. The craft system has always been present within the railroad industry. When freight brakemen positions were eliminated by the diesel engine, the brakemen could not bid on the train porter

---

1. See United States v. Jacksonville Terminal Co., 451 F.2d 418, 443–448 (CA5 1971).

2. See United States by Clark v. St. Louis-San Francisco Railway Co., 52 F.R.D. 276 (E.D.Mo.1971) (cases cited at 277–278).

[redacted]

positions regardless of the seniority they possessed. Now, the court is confronted by the reverse situation. In effect, the train porters seek super-seniority. Such is not the intent of the Civil Rights Act." 52 F.R.D. 276, 285.

The Supreme Court in Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283, decided in 1952, enjoined discrimination against employment of Negroes by reason of race. It cannot be fairly assumed that the railroad would continue to discriminate in violation of the injunction. I find no substantial evidence of any discrimination since 1952. In a subsequent action, Howard v. St. Louis-San Francisco Ry. Co., supra, at p. 911 of 361 F.2d, we accept the District Court's finding of absence of discrimination stating: "The record fails to establish a pattern of discrimination, or collusive action between Frisco and Brotherhood."

I find no substantial evidence in the record which reflects that any of the train porters applied for or were denied brakemen's positions.

There is substantial evidence that the train porter's position was a less hazardous and less burdensome job than that of brakemen and carried regular and more desirable hours. Judge Harper points out:

> "The record indicates that some Negro train porters preferred assignments to the train porter craft, for in the train porter craft the train porter was not subject to the physical labor that the brakemen performed at the freight level. The testimony of train porters Howard (Deposition pp. 34–5) and Bagley (Deposition pp. 130–1) shows the above to be true." 52 F.R.D. 276, 284.

Train porters who as a matter of free choice sought train porter positions and who made no effort to apply for a brakeman job are not entitled to an artificial seniority which will disrupt the long existing brakemen's seniority system.

Judge Harper on the basis of the evidence before him determined that Frisco went out of its way to find employment for the train porters and that Frisco on its own accord provided the only relief that could possibly be ordered. He further properly found that granting the requested relief would inflict inequities upon the brakemen and disrupt the long-established seniority system.[1]

I would affirm the judgment of the trial court in all respects.

Judge MEHAFFY and Judge STEPHENSON join in this dissent.

[redacted]

1. In my view, a substantial question exists on whether Title VII of the Civil Rights Act effects a change in the longstanding uniform holdings of the courts that under the Railroad Labor Act the mediation board has exclusive jurisdiction to make class or craft composition determinations. Since this issue is not adequately briefed, or discussed in the majority opinion, I deem it inappropriate to discuss the issue.